**ANGELUS MILLING CO. v. NUNAN,**
Commissioner of Internal Revenue.

No. 156.

Circuit Court of Appeals, Second Circuit.

July 6, 1944.

Writ of Certiorari Granted Dec. 4, 1944.

See 65 S.Ct. 268.

Prew Savoy, of Washington, D. C., for petitioner.

F. E. Youngman, Sp. Asst. Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and A. F. Prescott, Sp. Asst. Attys. Gen., for respondent.

Before L. HAND, SWAN, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The Angelus Milling Company appeals from an order of the Tax Court of the United States, dismissing for lack of jurisdiction, a proceeding originally filed with the Processing Tax Board of Review, for the refund of a processing tax paid by it in compliance with the Agricultural Ad-

justment Act, 7 U.S.C.A. § 601 et seq. On August 20, 1941, the company filed its petition with the Board to review the Commissioner's disallowance of its claim for refund. The Commissioner moved to dismiss the proceedings for lack of jurisdiction, and this motion was denied on August 5, 1942. On August 21st of that year, he filed his answer, again setting up lack of jurisdiction. Congress abolished the Board on December 31, 1942, and transferred its jurisdiction to the Board of Tax Appeals— now the Tax Court of the United States— and on January 29, 1943, the Commissioner renewed his motion which this time the Tax Court granted on May 4, 1943. This appeal (petition to review) followed. The ground of dismissal was that the petitioner had never filed an adequate claim for refund, as allowed by § 903 of Title 7 of the Revenue Act of 1936, 7 U.S.C.A. § 645, and by the regulations promulgated thereunder: Articles 202, 601, 603, and 605, of Regulations 96.

The facts were as follows. The Angelus Milling Company is a New York corporation, having its principal office in Niagara Falls, New York; until June 13, 1933 it was known as "Middleport Flour Mills, Inc." The Niagara Falls Milling Company, Inc. is a similar corporation; and between July 9, 1933 and January 6, 1936, both companies were processors of wheat within the meaning of the statute. Throughout that period they had one and the same majority shareholder, the same president, the same officers, a common set of books of account, a joint bank account, and the same employees. On these books each company was charged with the cost of the wheat bought for it, and the cost of its manufacture, etc., and was credited with the selling price. Between July 9, 1933 and January 31, 1935, they filed with the Collector joint returns on account of their operations as processors, and paid over $324,000 in processing taxes. Between February 1, 1935 and November 30, 1935, the Niagara Company filed returns for itself and the Angelus Company, and paid the Collector $110,000. The Agricultural Adjustment Act was declared unconstitutional on January 6, 1936 (United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914), and on June 23, 1936, three claims were filed with the Commissioner, all stating the name of the taxpayer and claimant as "Niagara Falls Milling Company, Inc. and/or Middleport Flour Mills, Inc." (We shall call these claims: A-1, A-2 and A-3.) A-1 was for $57,875.45, payments made by the Niagara Falls Milling Company between July 31, 1933 and December 30, 1933; A-2 was for $244,895.40, payments made by that company between January 29, 1934 and December 31, 1934; and A-3 was for $131,274.-42, payments made by that company between January 30, 1935 and December 12, 1935. The total of these is $434,045.27.

The Angelus Company does not assert that these claims conformed with the statute or regulations; but while they were still undetermined, on June 30, 1937, the Niagara Company filed a claim for refund on its own behalf alone in the sum of $436,-231.73, for payments made between July 15, 1933 and December 30, 1935. This claim (which we shall call Claim B), was in proper form, and the Commissioner had power to consider it; though only as a claim of the Niagara Company. Although the amount claimed differs by about $2000 from the aggregate of the amounts claimed in Claims A-1, A-2 and A-3, it was apparently intended to cover the processing taxes paid by both companies. On August 15, 1938, the Angelus Company filed a claim on its own behalf for the refund of $145,839.12 (which we shall call Claim C). This was not in proper form; it complied in no way with the regulations, it merely contained, as an appendix, an apportionment between the Angelus Company and the Niagara Company of the aggregate to a penny of the amounts claimed in Claims. A-1, A-2 and A-3. In an attached affidavit. it declared that it "was originally filed. * * * in the name of the Niagara Falls. Milling Company and/or Middleport Flour Mills, Inc." It was an attempt apparently to perfect or amend Claims A-1, A-2 and A-3. On May 24, 1941, the Commissioner rejected Claim C on the ground that it was. incomplete under the regulations, and did not give him jurisdiction; and it is plain. that neither Claims A-1, A-2 and A-3, taken together, nor Claim C taken in conjunction with them were in any way sufficient and that no award could have been made under them. Lee Wilson & Co. v. Commissioner, 8 Cir., 111 F.2d 313; Id., 123. F.2d 232. The Angelus Company answers this objection in two ways. First, it says, that the Commissioner considered its claim upon the merits, and by doing so gave the taxpayer to suppose that he meant to consider the claim as it stood; and that this.

conduct "estopped" him from later rejecting it for irregularities of form. Second, it says that the five claims: A–1, A–2, A–3, B and C, which were all pending at the same time, collectively made an adequate claim by cross reference to one another, and should have been read together, in which case their meaning was plain.

The evidence upon which the company seeks to support the claim of "estoppel" is as follows. On November 18, 1938, the General Deputy Collector addressed a letter to the company's president at that time, Dickinson, asking leave to examine its records for the years 1935 and 1936, including its ledgers and minute books. This was granted. The company submitted two affidavits in opposition to the Commissioner's motion: one by O'Connor, its president at a later time; another by Lyon, a certified public accountant. In his affidavit O'Connor swore that he had procured photostatic copies of the "working papers" of two "representatives" of the Bureau of Internal Revenue, who examined the Angelus Company's records at the time they were examining those of the Niagara Company —a fairly obvious inference anyway, since there was only one set of records. These two officials, O'Connor swore, "investigated the claim for refund, of the Angelus Milling Co., Inc., on its merits and sent Angelus Milling Co., Inc. a formal rejection of the claim on May 21, 1941." In his affidavit Lyon swore that on September 4, 5, 6 and 7, 1940, on behalf of the Angelus Company he had conferences with "representatives" of the Bureau "with respect to the claim for refund of processing taxes filed * * * on or about August 15, 1938. There were four or five representatives * * * present at the conferences; * * * in the four days' conference the representatives * * * investigated fully the merits of the claim of Angelus Milling Co., Inc. for its refund of processing taxes legally collected."

■■ Since the Tax Court disposed of the petition upon motion to dismiss, and not after a hearing, the company is entitled to insist that we take in its favor any implications which can be drawn from this evidence; and we shall dispose of the appeal upon that assumption. Moreover, we shall also assume that, if the controversy had been between private parties, and if the Commissioner's "representatives" did in fact consider the claim upon the merits to the knowledge of the company's president and accountant, without suggesting that it was insufficient in form, it would have been too late thereafter to reject it. Therefore the question comes to whether the Commissioner is subject to the same rules in that regard as are private parties. It is abundantly settled that after the Commissioner has once rejected a claim for irregularities in form, it is too late to amend it. Sugar Land R. Co. v. United States, 48 F.2d 973, 71 Ct.Cls. 628; Mutual Life Ins. Co. v. United States, 49 F.2d 662, 72 Ct.Cl. 204; Wausau Sulphate Fibre Co. v. United States, 49 F.2d 665, 72 Ct.Cl. 189; Solomon v. United States, 2 Cir., 57 F.2d 150; National Cattle Loan Co. v. United States, 7 Cir., 62 F.2d 168, 170; Elbee Chocolate Co. v. United States, 2 Cir., 63 F.2d 773; New York Trust Co. v. United States, 2 Cir., 87 F.2d 889, 113 A.L.R. 1287; Edwards v. Malley, 1 Cir., 109 F.2d 640, 645. In all these cases the time had necessarily already expired within which a claim could be filed, when the amendment was made, so that the taxpayer had to have an excuse for his delay. The opinions do not expressly say that, had the Commissioner not rejected the claim before the amendment was offered, the excuse would have been good; but it seems most likely that they so assumed, for otherwise it would have been unnecessary to resort to rejection as the ground of decision. However, so far as appears, the excuse in no case was the Commissioner's conduct in inducing the taxpayer to rely upon an irregular claim; and it is theoretically possible that a right of amendment after rejection might exist in that situation, even if it existed in no other. Indeed, the Fifth Circuit appears to have so held in United States v. Humble Oil & Refining Co., 69 F.2d 214. See also Weihman v. United States, D.C.E.D.Pa., 4 F.Supp. 155. Be that as it may, United States v. Memphis Cotton Oil Co., 288 U.S. 62, 72, 53 S.Ct. 278, 77 L.Ed. 619, is flatly to the contrary. The Commissioner had given as plain indication as he did here, that he meant to dispose of the claim upon the merits, and yet in the end he rejected it for defects in form only. The taxpayer won for two reasons: first, because the amendment did not substitute so divergent a claim as to be a new "cause of action"; and second, because the amendment had been filed before rejection. 288 U.S. at page 72, 53 S.Ct. at page 282, 77 L.Ed. 619. The second ruling necessarily presupposed that the rejection of a claim would cut off any opportunity for amendment, even

though the Commissioner had lulled the taxpayer into a false security. The language used was unequivocal: "An argument is made that at the time of this amendment the claim had been finally rejected and the proceeding thereby ended. If so, it was too late. McKesson & Robbins v. Edwards, supra [2 Cir., 57 F.2d 147]; Solomon v. United States, 2 Cir., 57 F.2d 150. When correction is thus postponed, there is no longer anything to amend, any more than in a law suit after the complaint has been dismissed."

■ There is therefore no distinction between the excuse of "estoppel" and any other excuse for delay in correcting a claim after rejection. A taxpayer who files a claim which does not conform with the statute, takes his chances that in the end the Commissioner may reject it, no matter how complaisant he may appear to be. The best he can hope is to amend before rejection; and indeed even before that occurs, he may not substitute a completely different claim. United States v. Henry Prentiss & Co., 288 U.S. 73, 53 S. Ct. 283, 77 L.Ed. 626; United States v. Andrews, 302 U.S. 517, 58 S.Ct. 315, 82 L. Ed. 398; United States v. Garbutt Oil Co., 302 U.S. 528, 58 S.Ct. 320, 82 L.Ed. 405. This doctrine that no amendment may be too divergent helps to confirm the doctrine that rejection puts an end to all amendments, on which we are relying here. In point of justice it is as harsh to deny a taxpayer the privilege of substituting an altogether new claim after the time has expired, as it is to deny him the privilege of correcting irregularities in his claim after rejection. For, by hypothesis, in both cases the Commissioner has given the taxpayer reason to suppose that he will consider the claim upon the merits, and by so doing has caused him not to amend while he could. It makes no difference to the taxpayer what was his mistake; in either case he awakes to learn that it is never safe to put his trust in officials. The notion behind the doctrine is the familiar one that, not only may not the United States be sued unless it consents, but that its consent must be closely scrutinized and jealously circumscribed. That principle goes back to the beginning of the Republic, and the Supreme Court has never shown any tendency to relax it. How far a government should accept the same responsibility for defaults of its agents that it imposes upon individuals, is clearly a matter for Congress. The result is often extremely harsh, as this case shows; but he who deals with the government must dot his i's and cross his t's; and if he assumes that he may rely upon the ordinary rules which apply as between individuals, he is doomed to disappointment.

■ There remains the second question: whether Claim C should be taken as conforming with the regulation because it incorporates Claim B by reference. It certainly did not do so expressly; on the contrary, as we have seen, it speaks of Claims A–1, A–2 and A–3 as its original and merely asks an apportionment of the sums demanded in them. Since Claims A–1, A–2 and A–3 were themselves insufficient, Claim C can of course gain nothing from them; and the only possible argument would be to say that Claim B was intended as a substitute for Claims A–1, A–2 and A–3, and that therefore when Claim C incorporated within itself Claims A–1, A–2 and A–3, it incorporated the substitute as well. That was certainly not the intention; Claim C having expressly referred to Claims A–1, A–2 and A–3 as its original, although Claim B was already in existence—and incidentally was the claim of another claimant—could not have intended to make that claim a part of itself. It is true, as we have said, that Claim B on comparison with Claims A–1, A–2 and A–3, showed that apparently it included the taxes of both companies. But what was the Commissioner to infer from that? Nothing more than that somewhere amid the tangle of claims these two companies were making claim for all processing taxes paid collectively by both. It seems unnecessary to labor the argument that to treat the regulations as countenancing anything of the kind would be in effect to repeal them.

Order affirmed.