JOHN RANDOLPH HOPKINS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9931. Promulgated August 29, 1950.

*Benjamin Mahler, Esq.*, for the petitioner.
*Henry C. Clark, Esq.*, for the respondent.

ARUNDELL, *Judge:* The respondent has determined deficiencies against petitioner in the amount of $25,121.39 for the calendar year 1939, $22,275.01 for the calendar year 1940, and $38,737.53 for the calendar year 1941.

The petitioner assigns errors in the respondent's determination:

(1) That certain annual sums received by petitioner from Lambert Pharmacal Co. constituted ordinary income rather than (a) capital gains, or (b) tax-free amortization of a wasting asset.

(2) That assignment by petitioner of $12,000 annually of the payments receivable from Lambert Pharmacal Co. was ineffective to relieve him of taxability on the sums so assigned.

(3) That petitioner did not sustain a deductible loss of $44,280 in 1940 by reason of a sale of alleged farm property at Stockbridge, Massachusetts.

(4) That petitioner did not sustain a deductible loss of $45,000 in 1941 by reason of a sale of alleged farm property at Cambridge, Maryland.

(5) That petitioner was not entitled to an abandonment loss deduction of $26,191 in 1941 on inherited property located at 1045 Fifth Avenue, New York City.

(6) That petitioner was not entitled to an abandonment loss deduction of $27,600 in 1941 on inherited property located at Irvington, New York.

(7) That petitioner was not entitled to an abandonment loss deduction of $1,987.50 in 1940 on inherited property located at Old Forge, New York.

(8) That petitioner was not entitled to a loss deduction of $12,-786.13 either in 1939 or 1940 by reason of the partition sale of inherited property located at Palm Beach, Florida.

(9) That petitioner was not entitled to deduct $9,785.38 back taxes paid by him in 1940 to redeem property located at Stockbridge, Massachusetts.

(10) That petitioner was not entitled to deduct $375 in each of the taxable years 1940 and 1941 by reason of a $1,500 discount on a $10,-000 loan obtained by him in 1940.

(11) That petitioner was not entitled to deduct the cost of repairs to the yacht Sea Phantom claimed to have been used by him for commercial purposes and claimed to have been paid as follows:

(a) $1,068.99 paid in 1939 to Daytona Beach Boat Works, Inc.

(b) $19,175.98 paid in 1941 to Daytona Beach Boat Works, Inc.

(c) $1,083.30 paid in 1941 to Clive Merchant Co.

(12) That petitioner was not entitled to deduct the sum of $521.04 in 1941 in respect to taxes upon certain Palm Beach property. This issue was conceded on brief by petitioner.

The proceeding has been submitted upon the pleadings, testimony, and a stipulation of facts with appended exhibits.

Petitioner is an individual, with address % Mr. Joseph Frank, 11 West 42nd Street, New York 18, New York. His income tax returns for the period involved herein were filed with the collector of internal revenue for the second district of New York. Petitioner is the son of Russell and Vera Lawrence Hopkins and a great-grandson of Dr. J. J. Lawrence.

### FACTS AS TO ISSUE 1—TAXABILITY OF ROYALTY INCOME.

On April 20, 1881, one Jordan W. Lambert executed the following instrument in writing:

Know all men by these presents, that for and in consideration of the fact, that Dr. J. J. Lawrence of the City of St. Louis, Mo., has furnished me with the formulae of a medicine called Listerine to be manufactured by me, that I Jordan W. Lambert, also of the City of St. Louis, Mo., hereby agree for myself, my heirs, executors, and assigns, to pay monthly to the said Dr. J. J. Lawrence, his heirs, executors or assigsn [sic], the sum of twenty dollars for each and every gross of said Listerine hereafter sold by myself, my heirs, executors or assignes [sic]. * * *

On January 2, 1885, J. W. Lambert and J. H. Peacock, president and secretary, respectively, of the Lambert Pharmacal Co., executed the following instrument in writing:

J. J. Lawrence of St. Louis, Missouri, having originated and heretofore sold to J. W. Lambert, the formulae and processes for the manufacture of two medical preparations, known as Listerine and Lithiated Hydrangea, with all the rights and benefits accruing therefrom and has received therein a monthly royalty from J. W. Lambert and J. W. Lambert having sold said formulae of Listerine and Lithiated Hydrangea to the Lambert Pharmacal Company, a corporation organized under the laws of the State of Missouri, and doing business in St. Louis, and furthermore said J. J. Lawrence having sold to said Corporation his sole and exclusive rights to the formulae and processes originated by him for making two preparations called "Dugonol" and "Metholated Camphor" [sic] therefore know all men by these presents that for and in consideration of these facts, the

said Lambert Pharmacal Company hereby agrees and contracts for itself and assigns to pay to the said J. J. Lawrence, his heirs, executors and assigns, six dollars on each and every gross of Listerine and Lithiated Hydrangea manufactured or sold by the said Lambert Pharmacal Company or its assigns, and ten per cent (10%) in gross amount of sales of the said Dugonol and Metholated Camphor, and all other goods which said Lambert Pharmacal Company or its assigns may hereafter manufacture or sell on formulae furnished by said Dr. J. J. Lawrence, account of sales to be rendered and payment of said royalty to be made in the third day of each month. In testimony whereof said Lambert Pharmacal Company has caused these documents to be sealed with its Corporate seal and signed by its President and Secretary this second day of January 1885.

On March 1, 1909, Dr. J. J. Lawrence executed a trust agreement in which he assigned, *inter alia:*

All my right title and interest in to and concerning the royalties and moneys due and to become due to me by the Lambert Pharmacal Company on sales of Listerine and of other articles and preparations manufactured and sold by it; * * *

The income from this trust was payable to the grantor during his life and upon his death, to his wife and granddaughter, Vera Lawrence Hopkins. The trust terminated upon the death of survivor of the settlor's wife and granddaughter and the principal was then to be distributed to the children of the granddaughter in equal parts. Petitioner, as one of the four surviving children of Vera Lawrence Hopkins, received his share of the above trust, including an undivided one-fourth interest in the assignments above referred to, when he attained his majority in 1932. He received the following payments from Lambert Pharmacal Co. under the terms of the above assignments:

| Year | Amount [1] |
|------|-----------|
| 1939 | $95, 826. 58 |
| 1940 | 95, 534. 99 |
| 1941 | 104, 100. 27 |

In addition to the formula for Listerine. Dr. Lawrence developed a number of other medical preparations. He furnished the formulae and processes for these preparations from time to time to various persons and corporations in return for payments to him based upon percentages of the gross amount of sales of these preparations. He transferred to the above trust his right to receive these payments as well as the payments from Lambert Pharmacal Co.

### OPINION—ISSUE 1.

Petitioner here asserts that the payments received from Lambert Pharmacal Co. for the years 1939. 1940, and 1941 were the proceeds

[1] Of the payments made by Lambert & Co. in each of the years 1939 to 1941. $12.000 was not paid to petitioner but was paid to Phyllis M. Hopkins pursuant to assignment filed by petitioner with Lambert & Co.

of a sale in 1885 by his great-grandfather, Dr. J. J. Lawrence, of all the latter's rights in the secret process and formula of the medicinal preparation, Listerine, and that such payments should therefore be taxable to petitioner as capital gains and not as ordinary income.

The basis of the petitioner's contention rests upon the 1885 instrument executed by Lambert Pharmacal Co. which we have set forth above in our findings of fact. This instrument declares an agreement by Lambert Pharmacal Co. to pay J. J. Lawrence, his heirs, executors, and assigns $6 on each gross of Listerine sold by the Lambert Pharmacal Co. It was signed by the president and secretary of the Lambert Pharmacal Co. but not by Dr. Lawrence.

Analysis of the above instrument and other related documents introduced by petitioner convinces us that the parties thereto intended a payment of royalties based upon the quantity of Listerine manufactured by Lambert Pharmacal rather than a sale to the company of the formula developed by Dr. Lawrence. Corroboration of this characterization of the transaction is found in the trust instrument subsequently executed by Dr. Lawrence in which he conveyed to a trust for his wife, granddaughter and children of his granddaughter "all my right title and interest in to and concerning the *royalties* and moneys due and to become *due to me by the Lambert Pharmacal Company on* the *sales* of *Listerine* and of other articles and preparations manufactured and sold by it; * * *." [Emphasis added.]

Our conclusion that the parties to the 1885 instrument intended a licensing arrangement rather than a sale derives principally from the fact that the instrument in question does not appear to constitute a conveyance of all Dr. Lawrence's rights to the Listerine formula. Dr. Lawrence did not sign the instrument and it is arguable whether he would have been bound by its terms. Nor does the instrument itself declare that Lambert Pharmacal acquired the *exclusive* rights to the formula. The instrument only declares that Lambert Pharmacal agrees to pay $6 for each gross of Listerine manufactured or sold by it. It does not state that the licensee corporation has acquired exclusive rights to "make, use, and vend" the Listerine formula. Where only the right to make and vend has been granted without the right to use, the Supreme Court, in the analogous field of patents, has held that the transfer then constitutes a mere license and that title to the patent does not pass to the transferee. *Waterman* v. *Mackenzie*, 138 U. S. 257. Cf. *Edward C. Myers*, 6 T. C. 258; *Federal Laboratories*, 8 T. C. 1150; *Kimble Glass Co.*, 9 T. C. 183; *Cleveland Graphite Bronze Co.*, 10 T. C. 974, 987.

It is true that in the recitation clause the 1885 instrument does refer to a previous "sale" by Lawrence to J. W. Lambert. This "sale", however, was based upon the 1881 instrument set forth in our findings

of fact. Petitioner concedes that the 1881 instrument was a mere license calling for royalties of $20 for each gross of Listerine manufactured by the licensee. In our opinion, the arrangement between Lambert Pharmacal and Dr. Lawrence contained in the 1885 instrument does not differ from the assignment set forth in the 1881 instrument between Lawrence and J. W. Lambert except for the change in the amount of the royalty to be paid. The latter instrument provides for a royalty of $6 per gross instead of the $20 per gross called for in the earlier instrument. Both instruments show a licensing arrangement rather than a sale. *Hopkins* v. *United States*, 113 Ct. Cls. 217, 82 F. Supp. 1015.

In effect, then, petitioner received as a remainderman under the trust created by his great-grandfather, Dr. Lawrence, a one-fourth interest in the right to the royalties paid by Lambert Pharmacal Co. to Dr. Lawrence's heirs and assigns. Such payments constitute ordinary income and are taxable to petitioner as such.

Even were we to assume petitioner's contention that the 1885 instrument constituted a sale, we doubt that we could allow his claim that the proceeds of such sale should be treated as capital gains rather than ordinary income. The development of Listerine by Dr. Lawrence was but one of a number of medicinal formulae and processes developed by him and made available to various pharmaceutical companies under arrangements similar to the one here involved, and it may well be that these formulae would be regarded as his stock in trade and thus not capital assets. *Harold T. Avery*, 47 B. T. A. 538; cf. *Carl G. Dreymann*, 11 T. C. 153.

Petitioner alternatively asserted in his petition that the right to receive payments from Lambert constituted a property right with limited life on a cost basis of not less than $8,000,000 and that he should be entitled to receive the payments involved tax free as the return of his cost basis, or that he should be entitled to deduct a pro rata proportion of such basis as annual depreciation. Petitioner failed to argue this alternative contention on brief and we deem it waived.

FACTS AS TO ISSUE 2—TAXABILITY OF INCOME ASSIGNED TO DISCHARGE ALIMONY OBLIGATION.

On April 13, 1937, the Circuit Court of Palm Beach County, Florida, awarded petitioner a divorce from his then wife, Phyllis M. Hopkins. The decree of divorce specifically incorporated a prior separation agreement executed by Phyllis and petitioner on December 11, 1936. This agreement provided:

VIII. That to secure the One Thousand ($1,000.00) Dollar monthly payments, as hereinbefore referred to, the party of the first part [petitioner] agrees to transfer, assign and set over to the party of the second part [Phyllis M. Hopkins]

the sum of One Thousand ($1,000.00) Dollars per month to be paid out of moneys due the party of the first part from his interest in the royalty contract between the party of the first part and the Lambert Pharmacal Company, a Missouri Corporation, and to authorize and direct the said Lambert Pharmacal Company to pay said sum monthly direct to the party of the second part so long as the said royalty contract produces a sum sufficient to make said monthly payments, but nothing herein contained shall be considered as a limitation of the right of the party of the second part to receive said monthly payments from other sources or a reservation or qualification of the obligation of the party of the first part to make the aforesaid monthly payments; it being understood and agreed that the party of the first part shall at all times have the right to substitute cash, or class AAA or highest grade marketable securities in a total amount sufficient to fully guarantee said monthly payments over the longest expectancy that might exist under the terms of this contract, the life expectancy of the party of the second part being based upon the American table of mortality, and upon the making of the aforesaid assignment from the party of the second part; provided, that in the event securities are deposited by the party of the first part the same shall be placed in a trust account in a reputable and responsible bank or trust company in trust for the benefit of the party of the second part, and the amount and market value of the aforesaid securities, through diminution in market value or otherwise, shall at all times be maintained in such amount and of such market value as to fully indemnify and guarantee the aforesaid monthly payments, the party of the first part retaining ownership of the said cash or securities, and their accruals of dividends and interest, and the right to withdraw such surplus amount of same should their value become over and above the amount necessary to fully and effectually carry out the terms of this agreement.

Petitioner filed an assignment with the Lambert Pharmacal Co. which, pursuant to the assignment, paid annually $12,000 of the total royalties due petitioner directly to Phyllis for the years involved herein.

### OPINION—ISSUE 2.

Anticipatory assignment of a portion of royalty payments to discharge an obligation to pay alimony will not be effective to shift the incidence of taxation from the assignor as petitioner here contends.

The payments in issue are for the years 1939, 1940, and 1941 and so are not affected by the changes made in treatment of alimony introduced by the Revenue Bill of 1942.

Petitioner relies upon the holding of *Helvering* v. *Fuller*, 310 U. S. 69, declaring the husband not taxable on the income of an irrevocable alimony trust where under local law the alimony provisions set forth in the decree gave the husband a full discharge of his marital obligations and left no continuing contingent obligation.

*Helvering* v. *Fuller* operated as a limitation on the prior case of *Douglas* v. *Willcuts*, 296 U. S. 1, which taxed alimony trust income to the husband where the trust did not completely and finally discharge the husband. Cf. *Helvering* v. *Fitch*, 309 U. S. 149; *Helvering* v. *Leonard*, 310 U. S. 80; *Commissioner* v. *Tuttle*, 89 Fed. (2d) 112. We

discussed this line of cases in *Harry T. Nicolai*, 42 B. T. A. 899, affd., 126 Fed. (2d) 927, and there said (at page 909):

\* \* \* As elucidated by the Supreme Court, it appears clear that where a husband in contemplation of divorce makes an absolute transfer to his wife of securities in full settlement of all of his marital obligations, the income from the securities thereafter received by his divorced wife is taxable to her. This is under the general principle that each individual is liable to income tax upon his own income. The situation is not different where the husband creates an irrevocable trust and transfers to a trustee securities the income of which is to be paid to the wife for life, with remainders over. It is only where the divorced husband has a continuing obligation to support the wife, either by virtue of local law or by the terms of the trust agreement, that the divorced husband is liable to income tax in respect of the income. \* \* \*

The reasoning of the alimony trust cases above cited is inapposite here as petitioner did not permanently set aside and irrevocably transfer securities or funds in full discharge of his marital obligations. He merely assigned a portion of the income and did not transfer the income producing property. Cf. *Lucas* v. *Earl*, 281 U. S. 111; *Helvering* v. *Horst*, 311 U. S. 112. The terms of the assignment are not in evidence but the provisions of the separation agreement set forth above in our findings of fact show that petitioner could at his option substitute cash or securities for the assignment in question. Such provisions are irreconcilable with an irrevocable assignment.

We hold that petitioner must include in his taxable income the $12,000 annual payments made by Lambert Pharmacal Co. to his divorced wife pursuant to petitioner's assignment. *George James Nicholson*, 3 T. C. 596.

FACTS AS TO ISSUES 3 AND 4—DEDUCTIBILITY OF LOSSES ON SALE OF MASSACHUSETTS AND MARYLAND PROPERTIES.

Petitioner in 1934 purchased property in Stockbridge, Massachusetts, of approximately 130 acres for $70,000. The principal value of the property was attributable to a residence, garage, house lot and lawn which was given an assessed valuation of $59,000 by the tax collector of the town of Stockbridge. The other property included a tenant house, house lot, wood house, tool house, hen house, pheasant house, bantam house, and pigeon house, and other land with a combined assessed valuation of $11,300. The residence was a three-story house of tile construction with fifteen rooms and five baths. Petitioner lived in this residence with his wife, two children, and four house servants, including a cook, a maid, a nurse, and a houseman, from the fall of 1934 to the spring of 1936. In addition to the household staff, petitioner retained two yardmen, one full time and one part time, and two or three other employees to care for the fowls. Approximately 275 to 300 chickens were raised and some sales of eggs and

chickens were made to local produce stores and to individuals. In addition to the chickens, some 200 pigeons, 30 to 40 bantams, and 40 to 50 pheasants were raised on the property. Some sales were made of the pheasants and pigeons but none were made of the bantams. The only other livestock on the property included a work horse, a saddle horse, and a pony. A crop of corn was grown on part of the property with rented equipment. Petitioner closed this residence in Stockbridge in the spring of 1936 and moved to Florida. The property was sold in 1940 for $20,900. It was not operated as a farm by the purchaser.

In the fall of 1937 petitioner purchased for $10,000 approximately 150 acres of land in Dorchester County near Cambridge, Maryland, with a water frontage of one-half mile. The property was known as Warwick Fort Manor, a run-down farm with no buildings except the walls of an old house built in colonial days and a wooden barn, both of which were removed by petitioner after purchasing the property. Approximately 70 acres of the property was farming area and the remainder consisted of a muskrat swamp, marshland, and woodland. The farm land was in poor condition. Petitioner constructed on the property a 12-room ranch style home of brick construction with adjoining garage, a brick gatehouse, a brick powerhouse with concrete base, a gravel lane and courtyard of gravel. He also constructed a pier on the property. The total improvements cost approximately $80,000. The house itself was about 350 feet long built in a U shape with shaded courtyard and porch running the length of the house. On one wing was the servants' quarters and their dining room, a long serving pantry, a large modern kitchen with built-in refrigerator with capacity for nearly a ton of food. Then came a large dining room, living room with bar at one end and powder room at the other end, master bedroom with large dressing room, game room, office, and four bedrooms with baths. Petitioner remarried in October 1937, shortly after purchasing the property. Before the construction was completed, he moved into the residence with his second wife, two children, and nurse. A maid came in daily to do the washing. New furnishings were purchased as the second wife did not care to use the Stockbridge furniture formerly used by petitioner's first wife. Petitioner lived in this residence in 1938, 1939, and 1940. Electric power for the house was supplied by a Diesel generator, housed together with an auxiliary in the powerhouse. It also supplied power for the gatehouse and for a water pump. A tenant farmer, one Joseph Wanex, who had farmed the property prior to its purchase by petitioner, continued to farm the land in 1938 under an agreement to share 2-fifths of any profits with petitioner after deducting expenses from the proceeds of crop sales. Wanex raised cantaloupes, tomatoes, beans, cucumbers, peas,

and grain. No profits were realized from these crops and petitioner paid the expenses of the casual laborers employed in cleaning up the turnrows and in harvesting. About 1,000 peach trees, 6 acres of strawberries, and some asparagus plants were also set out under the supervision of Wanex but these did not yield crops in 1938. In 1939, 1940, and 1941 another tenant farmer, one Wilbur Colbourn farmed the land on a share basis and acted as caretaker of the grounds for petitioner. Colbourn raised only two crops, strawberries and asparagus on a total of 19 acres. Petitioner in 1941 sold Warwick Fort Manor for approximately $31,000 with the land and all the improvements he had made thereon. The property was purchased as a country estate, not a farm.

The incidental farming activities carried on by petitioner on the above estates were primarily for his own recreation and pleasure.

### OPINION — ISSUES 3 AND 4.

On these issues petitioner urges that he sustained losses in 1940 and 1941, respectively, on the sales of Massachusetts and Maryland farm properties and claims that these losses should be deductible in full as losses sustained in the operation of a business. Section 23 (e) (1), I. R. C.[2]

Petitioner alleged in his petition that he sustained a loss in the amount of $44,280 on the sale of the Massachusetts property in the year 1940 and a loss in the amount of $45,000 on the sale of the Maryland property in 1941. On brief, petitioner asserts (1) that he sustained a loss of $29,300 on sale of the Massachusetts property of which he claims $17,881.26 is applicable to business assets; and (2) that he sustained a loss of $55,114.68 on sale of the Maryland property of which he claims $32,894.68 is applicable to business assets. This reduction in the extent of his alleged business losses on the sales of these properties apparently results from a recognition that losses on sales of a taxpayer's residences cannot be deducted from his income as business losses. Regulations 103, section 19.23 (e)–1.[3]

We have then the question of whether losses on the sales of the entire properties can be attributed pro rata to portions thereof because of claimed farming operations.

From the record as a whole, we find no substantiation for petitioner's claim that he purchased or operated these properties with a view to realizing a profit by farming. We are compelled to hold that such

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions :

\*   \*   \*   \*   \*   \*   \*

(e) Losses by Individuals.—In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

(1) if incurred in trade or business ; \* \* \*

[3] A loss on the sale of residential property purchased or constructed by the taxpayer for use as his personal residence and so used by him up to the time of the sale is not deductible. \* \* \*

farming activities as were carried on in conjunction with these properties were incidental to the residential purposes that motivated their selection. The disproportionate values of such parts of the properties as were clearly residential in nature strikingly illustrate the incidental nature of the portions which petitioner claims were devoted to the business of farming. The manifestly residential portions of the Massachusetts property were valued at approximately $60,000 of the $70,000 total cost. The claimed farming activities there consisted of the raising of approximately 300 chickens, 200 pigeons, and 50 pheasants and of sales of eggs and fowls on a small scale.

In Maryland, petitioner erected on land costing $10,000—of which nearly half the acreage was marsh land or woodland and even the tillable acreage was of poor quality—a spacious residence of his own design. This residence with its appurtenances in the form of improvements built by him such as a gatehouse, garage, gravel courtyard and drive, cost him about $80,000. The water frontage of the property enabled him also to build a pier at which he could dock his cabin cruiser.

In the first year of his residence there, petitioner permitted a tenant farmer to continue to farm the tillable acreage on a share crop basis but thereafter substituted another tenant farmer who served as caretaker of the property. Such farming of a portion of the property by a profit-sharing tenant does not necessitate the conclusion that the taxpayer is engaged in the business of farming if the primary function of the property is residential. *Morton* v. *Commissioner*, 174 Fed. (2d) 302, certiorari denied, 338 U. S. 828.

Moreover, even if petitioner's testimony had shown that he purchased the properties intending to devote certain portions of them to commercial farming, we would find it difficult, if not impossible, to allocate properly between the residential and non-residential portions in determining petitioner's loss. In connection with neither of the properties did he show the extent and nature of his receipts and disbursements from the claimed farming operations. He apparently kept no books whatsoever. The testimony of his expenditures on the properties came chiefly from his own estimates. Then, too, the alleged business use of a portion of the properties was so inextricably interwoven with the occupancy and enjoyment of these country estates by petitioner and his family that allocation would prove meaningless. In such a case as this the principle of *Cohan* v. *Commissioner*, 39 Fed. (2d) 540, has no application.

It should also be noted that petitioner did not claim these losses on his original tax returns but asserted them for the first time in his petition filed in the present proceeding. Furthermore, in neither instance were the properties which he sold at such losses acquired as farms by

the respective purchasers. They were interested, just as petitioner had been before them, in acquiring country estates.

We conclude that such farming activities as petitioner caused to be carried on in connection with the Massachusetts and Maryland properties were conducted primarily for his own recreation and pleasure rather than as a commercial enterprise entered into for profit. Cf. *Estate of Mortimer B. Fuller*, 9 T. C. 1069, 171 Fed. (2d) 704, certiorari denied, 336 U. S. 961; *Reginald C. Vanderbilt*, 5 B. T. A. 1055, affd., sub nom, *Deering* v. *Blair*, 23 Fed. (2d) 975; *Louise Cheney*, 22 B. T. A. 672.

The losses that petitioner sustained on the sales of these properties must therefore be held "personal, living, or family expenses" and nondeductible under section 24 (a) (1), Internal Revenue Code.

FACTS AS TO ISSUES 5 AND 6—TIME WHEN LOSSES INCURRED ON CERTAIN INHERITED REALTY.

Petitioner inherited from his father, Russell Hopkins, who died in 1919, an undivided one-fourth interest in a 5-story one-family building located at 1045 Fifth Avenue, New York City. The realty was valued for Federal estate tax purposes on the return of the estate of Russell Hopkins at $155,000. It was then subject to a mortgage of $80,000. The property was a family residence prior to the death of petitioner's father but was not thereafter used as a residence by any member of the Hopkins family. It was rented in 1920. In 1921 the guardian for petitioner and his three infant sisters sold the property by leave of court for $124,000, the purchaser accepting conveyance subject to the outstanding first mortgage and giving a second mortgage of $30,000 as part of the purchase price. On default of the purchaser on the second mortgage the premises were repossessed in 1922; the guardian paid off and received a discharge of the $80,000 first mortgage in 1927. In 1919 the property was assessed at a valuation of $140,000 for New York City real estate tax purposes. In 1922 the property assessment was increased to $170,000, of which $120,000 was attributed to the land and $50,000 to the building. This assessment was continued through 1928. In 1940, 1941, and 1942 the property was assessed at $100,000, of which $91,000 was attributed to the land and $9,000 to the building.

On June 18, 1940, the New York City Department of Housing issued an unsafe building notice which directed that structural defects in the building be repaired or that the building be razed. Petitioner and his sisters did not comply with this notice.

Taxes were paid upon the property until 1936. Thereafter, the taxes were permitted to accumulate. Arrearages of taxes and water rents amounted to $26,406.73 on August 7, 1942, when the City of New York purchased the property for the amount of its tax lien.

These arrearages became a lien upon the property as of November 10, 1941, and included taxes, water rent, and interest in the amount of $1,606.35 for the first half of the fiscal year 1941–1942. The building was demolished subsequent to the foreclosure of the property by the city.

In the year 1941 the building possessed no value. The fair market value of the land in 1941, after deducting the cost of razing the building, was $26,000.

Petitioner also inherited from his father an undivided one-fourth interest in land and buildings at Irvington, New York. The fair market value of this property as of the death of the decedent in 1919 was $195,000. It consisted of 54 acres of land and two principal buildings. The fair market value of the buildings in 1919 was $92,000. In 1929, 17 acres and one of the buildings were sold for $105,000. The fair market value as of 1919 of the remaining buildings was $40,000. All of the remaining property was listed for sale with a real estate broker until the year 1941. It was assessed by the adjacent village of Tarrytown and the town of Greenburg for 1941 at approximately $140,000. Annual taxes levied by Greenburg and Tarrytown against the property amounted to $4,871.81 in 1941. Taxes on the property were in arrears in 1941 in the amount of approximately $32,000, plus interest.

As of 1941, the buildings on the property were valueless and the land was worth approximately $600 per acre, or a total value for the property of approximately $22,000. Petitioner in 1941 informed the broker with whom the property was listed for sale that he and his sisters had determined to abandon it because the taxes had accrued beyond its value and there appeared to be no sale for the property. The property was not listed with the real estate agent after 1941. It was taken over for taxes and sold subsequent to 1941.

### OPINION—ISSUES 5 AND 6.

Abandonment losses on the Fifth Avenue and Irvington properties are claimed by petitioner to have occurred in 1941.

Petitioner inherited his undivided one-fourth interest in these properties upon the death of his father in 1919. Although the properties had been previously devoted to residential use by the Hopkins family, no personal use was made thereof following the death of the decedent. The properties were held for sale and thus must be classified as business properties. *N. Stuart Campbell*, 5 T. C. 272; *Estelle G. Marx*, 5 T. C. 173; I. T. 3776, 1946–1 C. B. 65.

In regard to the Fifth Avenue property, petitioner's expert real estate witness testified that the fair market value of the property at the close of 1941 was not less than $26,000. In his valuation he discounted entirely the building which he regarded as representing a minus value.

Deducting this cost of razing the building, he still placed a value upon the property of at least $26,000 as of the end of 1941. His opinion of value was based not only upon his long experience as a New York realtor but was given after a careful study of the values of surrounding property, including the sale of a practically identical adjoining plot within the valuation period. We regard his valuation as a fair and accurate appraisal.

In the light of this testimony of petitioner's expert witness, the unsafe building notice upon which the petitioner so heavily relies as evidence of abandonment becomes immaterial. Since the building represented a negative value factor in 1941, any decisions of petitioner about the advisability of repairing it could not be conclusive evidence that he had abandoned the whole property. Moreover, the building violation would in no way substantiate petitioner's claim that he abandoned the property in the year 1941. The violation notice was issued by the city in 1940, not in 1941.

When the city foreclosed the property for its tax lien in 1942, the arrearages then amounted to $26,406.73. Thus, as of the latter part of 1941 when the tax levy for the first half of the fiscal year 1941–1942 became a lien upon petitioner's property the tax arrearages were approximately equal to the then fair market value of the property. We do not regard the substantial equivalence of the tax lien and the fair market value of the property as sufficient proof that all value disappeared within the taxable year. Cf. *Alice V. Gordon*, 46 B. T. A. 1201, affd., *Helvering* v. *Gordon*, 134 Fed. (2d) 685; *Intercounty Operating Corp.*, 4 T. C. 55. Absent some objective identifiable event establishing the owner's recognition that his equity in the property has been lost through worthlessness we cannot hold that he is entitled to a loss in full within the taxable year. Mere inaction when declining market values and increasing tax arrearages point toward worthlessness will not suffice. Since it cannot be said that the equity of petitioner and his sisters in the Fifth Avenue property was shown to have disappeared within the year 1941, we must deny petitioner an abandonment loss on this property.

With respect to the Irvington property, however, the evidence clearly establishes that the tax arrearages had greatly exceeded the fair market value of the property by the year in which petitioner first seeks to take his loss. Here, a definite recognition of the loss of their equity was shown by petitioner and his co-owners. He notified the real estate agent with whom the property was listed for sale that he was abandoning the property because the accumulated back taxes appeared greatly in excess of any likely sales price for the property. Accordingly, the property was no longer listed for sale by the broker after 1941. Since the property was subsequently taken over and sold

for taxes by the local authorities, it is evident that petitioner and his co-owners sustained a substantial loss therein. In view of their proved intent to abandon the property in 1941, we believe this loss should properly be ascribed to that year. *W. W. Hoffman*, 40 B. T. A. 459, aff'd., 117 Fed. (2d) 987; *Bickerstaff* v. *Commissioner*, 128 Fed. (2d) 366; *Denman* v. *Brumbach*, 58 Fed. (2d) 128.

Basis-wise. petitioner's loss in his one-fourth interest in this inherited realty depends on its fair market value at the date of acquisition from the decedent. Section 113 (a) (5), Internal Revenue Code. *George W. Carnrick*, 9.T. C. 756, 759. In the absence of more convincing evidence, we have found the fair market value of the property at the date of decedent's death to be the value fixed in the estate tax return. namely, $195,000. Subtracting the $105,000 which was realized from the prior sale of part of the property, we arrive at a basis of $90,000 for the remaining land and buildings. This figure must be further reduced by the amount attributable to buildings, as petitioner's experts testified that the latter were valueless in 1941. The burden of proof is on petitioner to show that the amount of depreciation allowable on account of the buildings was not equal to petitioner's basis thereon. This he has not done. Therefore, we conclude that petitioner's adjusted basis with regard to the buildings was zero in 1941, and that the adjusted basis of the abandoned property was $50,000 of which petitioner's one-fourth interest amounts to $12,500. His loss on abandonment of this interest may accordingly be deducted in full in 1941.

On brief. petitioner has also asked for deductions for depreciation in respect to both properties for the tax years here before us. This claim for depreciation was not made in either the original or amended petitions but was set forth for the first time on brief. In regard to the Fifth Avenue property. petitioner himself testified that the building had a remaining useful life of 10 to 20 years from the date of his father's death in 1919, depending upon whether it was kept in good repair. The unsafe building notice issued in 1940 clearly shows that the building was not properly maintained. We have already noted that for both the Fifth Avenue and Irvington properties the expert witnesses for petitioner testified that the buildings were valueless in 1941. In this state of the proof and for the reasons outlined above, it appears necessary to regard the buildings on both properties as fully depreciated prior to the years in question.

FACTS AS TO ISSUE 7—AMOUNT OF ALLOWABLE LOSS INCURRED ON TAX FORECLOSURE OF CERTAIN INHERITED REALTY.

Petitioner inherited from his father. Russell Hopkins, an undivided one-fourth interest in various parcels of realty located at Old Forge, New York, valued in the estate of Russell Hopkins as follows:

| | |
|---|---:|
| Land—11 lots on lake | $2,200 |
| Land—2 lots on bay | 300 |
| Land—in block 103 | 750 |
| Land—5 lots north side DeCampe Rd | 500 |
| Buildings on block 103 | 2,650 |
| Land—4 lots on Eagle Bay Rd | 400 |
| Land—11 lots Nos. 36–45 incl. Eagle Bay Rd | 1,000 |
| Land—near Stroble Ave | 150 |
| Total | 7,950 |

The buildings on Block 103 were fully depreciated in the year 1940.

In 1940, the town of Old Forge foreclosed a tax lien upon the above property. Respondent determined that by reason of the foreclosure petitioner had sustained a capital loss of $1,112.50.

Petitioner was not engaged in the real estate business.

OPINION—ISSUE 7.

On this issue petitioner alleges that respondent erred in his determination of the adjusted basis of the Old Forge property and further alleges that the loss resulting from the tax foreclosure of the property was an ordinary loss deductible in full and not a capital loss as determined by respondent.

The parties have stipulated that respondent determined the capital loss of $1,112.50 by eliminating from the basis of $7,950 the sum of $3,500, representing the value of the improvements on the ground that they had been fully depreciated, thus giving an adjusted basis of $4,450, of which petitioner's interest was one-fourth or $1,112.50.

Since the parties apparently accept the valuation placed upon the Old Forge realty in the estate tax return of the decedent, Russell Hopkins, as the fair market value of the property at the date of decedent's death, we accordingly find the unadjusted basis of the property to be $7,950, of which $2,650 is attributable to buildings. As the aggregate allowable depreciation may not exceed the unadjusted basis of the buildings, respondent obviously erred in eliminating $3.500 from the unadjusted basis in determining the adjusted basis. We agree, however, with respondent's position that the buildings should be considered fully depreciated. Petitioner testified that he could not accurately state how old the buildings were at the death of his father. Furthermore, petitioner offered no evidence as to the nature of the buildings, the type of construction or any data as to their useful life other than his estimate that they "should last around fifty years, especially if they had been maintained." We accordingly hold, for the reasons stated in our opinion with regard to Issues 5 and 6, that the buildings were fully depreciated in 1940 and that the adjusted basis of the Old Forge property was $5,300 of which petitioner's one-fourth interest amounted to $1,325.

Having determined petitioner's adjusted basis, we come now to his contention that the loss sustained was an ordinary and not a capital loss. Petitioner maintains that the property involved did not constitute a capital asset within the meaning of section 117 (a) (1) of the Internal Revenue Code,[4] on the ground that it was property "used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1)," or, alternatively, that it was property "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." The property here involved consisted of unimproved realty with the exception of one tract upon which fully depreciated buildings were located. It is obvious that such unimproved realty does not constitute property "used in the trade or business, of a character which is *subject to the allowance for depreciation* provided in section 23 (1)." (Emphasis added.) The cases cited by petitioner, which involved the sale of land, *Leland Hazard*, 7 T. C. 372, and *Solomon Wright, Jr.*, 9 T. C. 173, dealt with property sold in years subsequent to December 31, 1941, and thus were governed by the change in section 117 (a) (1) effected by section 151 of the Revenue Act of 1942. *George W. Carnrick*, 9 T. C. 756, 761. Nor does the evidence introduced by petitioner furnish any basis for a finding that he was engaged in the business of selling unimproved realty. There was no proof of any real estate dealings such as platting or subdividing the property for development of the property. Cf. *McFaddin* v. *Commissioner*, 148 Fed. (2d) 570. In fact, petitioner and his co-owners were not shown to have done anything more than list the property for sale. We find no merit in petitioner's contention that the Old Forge property was property "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Cf. *Harriss* v. *Commissioner*, 143 Fed. (2d) 279.

Petitioner does not argue that the foreclosure of its tax lien by the town of Old Forge does not constitute "a sale or exchange." This argument, if made, would be foreclosed by the holding of the Supreme Court in *Helvering* v. *Hammel*, 311 U. S. 504. We hold, therefore, that the loss sustained by petitioner by reason of the tax lien foreclo-

---

[4] Internal Revenue Code (1940) :

SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), or an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.

sure in 1940 constitutes a capital loss and is thus subject to the percentage limitations of section 117 (b). Cf. *Beck* v. *Commissioner,* 179 Fed. (2d) 688.

FACTS AS TO ISSUE 8—LOSS ON PARTITION SALE OF CERTAIN INHERITED·
PROPERTY.

The petitioner inherited from his father, Russell Hopkins, an undivided one-fourth interest in a 13-acre parcel of land running from Lake Worth to the Atlantic Ocean, Palm Beach, Florida, which parcel was known as Arcadia and was valued at $75,000 for Federal estate tax purposes in the estate of Russell Hopkins. Its fair market value at the death of the decedent was $75,000.

In 1938, petitioner formed Arcadia Corporation under the laws of Florida for the purpose of developing and selling ·the Arcadia property. Petitioner conveyed his one-fourth interest in the Arcadia. realty to the Arcadia Corporation for 45 shares of its stock, 5 additional shares of the corporation's stock having previously been issued, of which 3 shares were issued to petitioner for an undisclosed amount of cash, one to petitioner's then wife as a qualifying share, and one to· petitioner's attorney, J. W. Salisbury, for services rendered.

The Arcadia Corporation laid out the property into lots with two· on the lake front and the remaining lots behind a road that divided the property.

Petitioner's sisters, Susan Hopkins Whitmore, Josephine Hopkins Tucker, and Minnie Hopkins Gilbert, the co-owners of the Arcadia realty, had originally planned to join petitioner in the Arcadia Corporation in developing the property. These plans did not materi-- alize, however, and petitioner's sisters instituted a partition action in 1939 in the Circuit Court of Florida for Palm Beach County. The court adopted the report of its commissioners following an agreed statement of facts by the parties and decreed that the property be partitioned. At the partition sale, the sisters purchased the property for $42,500, paying in their three-fourths interest in lieu of cash and for the remaining one-fourth share paying cash in the amount of $10,625, less expenses, making a total of $10,158.92 paid by petitioner's sisters to the court. The court paid over the latter amount by check to Arcadia Corporation ·which endorsed the check over to petitioner.

Arcadia Corporation filed no corporate reports after 1939 and was· dissolved in 1943 by proclamation of the Governor of the State of. Florida for failure to pay its corporate capital stock tax.

OPINION—ISSUE 8.

On this issue respondent seeks to disregard the corporate entity of the Arcadia Corporation and to deny petitioner any loss resulting from

the partition sale of the property by Arcadia to his sisters on the theory that the transaction was, in substance, an intrafamily one so that a loss would be disallowed by reason of section 24 (b) (1) (A) of the Internal Revenue Code.[5]

Petitioner contends that Arcadia was no dummy or sham but was organized to accomplish a legitimate business purpose and that he should be permitted a capital loss in 1939 on its liquidation. From the evidence, it is clear that petitioner originally formed the Arcadia Corporation in 1938 for the purpose of developing and selling the Arcadia real estate which he owned jointly with his sisters. He transferred to the corporation his undivided one-fourth interest in the property in exchange for substantially all of the stock of the corporation then issued and outstanding. As a preliminary step to the subdivision and sale of the property, the corporation laid out the property in lots. It was originally planned that petitioner's sisters, as co-owners of the property, would join him in the corporation. Presumably, because of differences arising among them, however, these plans did not materialize and his sisters instituted an action for partition of the property the following year.

While it is true that the corporation was wholly owned by the petitioner except for qualifying shares and that it never actually sold any lots, it is equally manifest that a business purpose motivated its formation. It has been repeatedly affirmed that a corporation is a taxpayer separate and distinct from its stockholders even where all of its stock is owned by one individual, and that its corporate entity may be disregarded only where it is shown to be a fiction or sham. *Estate of L. B. Whitfield*, 14 T. C. 776; *Moline Properties* v. *Commissioner*, 319 U. S. 436; *National Carbide Corp.* v. *Commissioner*, 336 U. S. 422. There is nothing in the evidence to suggest that petitioner formed the corporation to accomplish the sale of the property to his sisters for the purpose of avoiding the ban of section 24 (b) (1) on losses arising from intrafamily sales.

Petitioner admits that the loss upon the sale of the property by the corporation to his sisters might properly be denied *to the corporation* because of the statutory language of section 24 (b) (1) (A) prohibiting deduction of the loss on a sale *"directly or indirectly* between members of a family." (Emphasis added.) That question, however, is not before us. Petitioner claims that since his loss was sustained

---

[5] SEC. 24. ITEMS NOT DEDUCTIBLE.

    \*      \*      \*      \*      \*      \*      \*

  (b) LOSSES FROM SALES OR EXCHANGES OF PROPERTY.—

  (1) LOSSES DISALLOWED.—In computing net income no deduction shall in any case be allowed in respect of losses from sales or exchanges of property, directly or indirectly—

    (A) Between members of a family, \* \* \*.

    (B) Except in the case of distributions in liquidation, between an individual and a corporation more than 50 per centum in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual;

on liquidation of the corporation, it falls within the exception of section 24 (b) (1) (B), *supra.* If the testimony indicated that petitioner had formed the corporation to obtain a deductible loss on liquidation which he could not obtain on the sale by either himself or the corporation to his sisters, then it would be incumbent upon us to seek out the substance of the transaction, treat the corporation as petitioner's *alter ego,* and deny him a loss upon liquidation. In the absence of such evidence showing that the corporation was a mere fiction or sham, we must allow petitioner's claim.

When the corporation endorsed to petitioner the check which represented the proceeds of the sale of its one-fourth interest in the Arcadia realty, it distributed to him substantially all of its assets. Such distribution may properly be regarded as a liquidation of the corporation. The basis of petitioner's stock is, under section 112 (b) (5), the basis of the property which he gave in exchange therefor. His basis for this property, the one-fourth interest in the inherited Arcadia realty, is $18,750. Section 113 (a) (5). Subject to the capital gains and losses provisions of section 117, his loss may be computed under Rule 50.

FACTS AS TO ISSUE 9—DEDUCTIBILITY OF TAX PAID ON REDEMPTION OF CERTAIN REALTY.

Petitioner stopped paying taxes on his Stockbridge, Massachusetts, property in 1936. In 1938, the town of Stockbridge purchased this property for the taxes then in arrears, and a tax collector's deed was issued to it. In 1940, petitioner paid to the treasurer of the town of Stockbridge the sum of $9,785.38 and received a certificate of redemption, such payment being in satisfaction of the tax for which the land was purchased by the town, plus all intervening taxes, interest and charges to the date of the deed, including the levy of the year 1940. Petitioner claimed the above sum of $9,785.38 in his 1940 income tax return as a deduction for taxes paid. Respondent disallowed the claimed deduction.

OPINION—ISSUE 9.

On this issue we sustain petitioner's contention that he is entitled to a deduction for taxes paid in 1940 by reason of the $9,785.38 paid to the town of Stockbridge to redeem property which the town had previously purchased under a tax sale.

Respondent argues that petitioner had lost title to this property by the tax sale and that the payment in question was a cost of reacquisition of such title and not a payment of taxes by petitioner. As authority, respondent cites *Magruder* v. *Supplee,* 316 U. S. 394. That case concerned the deductibility of taxes paid by a purchaser of realty

where under the local law the taxes had been assessed to the vendor who was personally liable for the taxes before the sale. It was there said:

> Thus either a pre-existing tax lien or personal liability for the taxes on the part of a vendor is sufficient to foreclose a subsequent purchaser, who pays the amount necessary to discharge the tax liability, from deducting such payment as a "tax paid".

Under the local law of Massachusetts, it appears evident that the petitioner was under a personal liability for the real estate taxes in question even after the town of Stockbridge had purchased the property in a tax sale. Annotated Laws of Massachusetts, Vol. 2, Tax Law, ch. 60, §§ 35, 50; see *Boston Five Cents Sav. Bank* v. *City of Boston*, 218 Mass. 181, 61 N. E. (2d) 124; *Richardson* v. *Boston*, 148 Mass. 508, cited in S. M. 4122, V–1 C. B. 55. Following a tax sale under Massachusetts law the owner retains the right of redemption until this right is foreclosed. Mass. Anno. Laws, *supra*, ch. 60, § 65. Such right may not be foreclosed, nor is the purchaser entitled to possession until two years after the date of the tax sale. Mass. Anno. Laws, *supra*, ch. 60, § 45. A town may purchase the property for taxes, *Coughlin* v. *Gray*, 131 Mass. 56, but it may not foreclose the owner's right of redemption until after the expiration of the statutory two-year period, *City of Boston* v. *Jenney*, 282 Mass. 168, 184 N. E. 464. Thus petitioner under the local law remained liable for the above taxes and exercised his statutory right to redeem the property by paying the taxes and interest in arrears. Mass. Anno. Laws, *supra*, ch. 60, § 62. Under the holding of *Magruder* v. *Supplee*, *supra*, such personal liability is determinative of deductibility. We accordingly find that petitioner, being on the cash receipts and disbursements basis, is entitled to deduct in 1940 the back taxes paid to redeem his property.

On brief, petitioner also seeks to deduct the sum of $334.61 as taxes paid in 1941 on the Maryland realty prior to its sale on June 6, 1941. The deductibility of these taxes was not raised in either petitioner's original or two amended petitions. Furthermore, on his 1941 income tax return petitioner has been allowed a deduction for Maryland taxes. We do not regard the deductibility of this item as being put in issue by the pleadings and, even if put in issue, it would be impossible from this record to determine whether all or any part of it had already been allowed as a deduction.

#### FACTS AS TO ISSUE 10—DEDUCTIBILITY OF LOAN DISCOUNT.

In 1940, petitioner sought a loan of $10,000 from Park Leasehold Corporation, a real estate corporation in which his then attorney, one Saltzman, was interested. Petitioner received $8,500 from Park

Leasehold by agreeing to pay back $10,000 in certain monthly payments until the debt was fully discharged. He repaid the total $10,000 loan in partial payments from time to time within the years 1940 through 1944 either by his own check or through payments made by the Chase National Bank under an escrow agreement. On his income tax return for 1941 petitioner deducted $128.25 as interest paid to Park Leasehold. Respondent disallowed deduction of this amount for lack of substantiation.

OPINION—ISSUE 10.

Petitioner claims in his petition a deduction of "$375 in each of the years 1940 and 1941 on account of a $1,500 bonus paid by him in 1940 to obtain a 4-year interest bearing loan from the Park Leasehold Corporation." On brief, he seeks a deduction of $300 in each of the years 1940 and 1941 computed on the basis of allocating the $1,500 "bonus" over a 5-year period or, alternatively, a deduction of $90 in 1940 and $540 in 1941 computed on the basis of alleged monthly payments. On his income tax return for 1941, he claimed a deduction of $128.25 for interest paid on the above loan.

Respondent disallowed the deduction for lack of substantiation and now argues that petitioner failed to prove the existence of the loan at the hearing. The only evidence of the loan which petitioner introduced was his own statements. On the other hand, respondent offered no proof that would discredit petitioner's testimony, and his cross-examination on this point only strengthened petitioner's account of the loan and its repayment. Petitioner has established to our satisfaction a *prima facie* case that he borrowed $10,000 in 1940 at a $1,500 discount so that he received but $8,500 from the lender. He has established, further, that either he or the Chase National Bank under an escrow agreement repaid the total $10,000 within the years 1940 through 1944.

Being on the cash basis, petitioner is only entitled to a deduction for interest actually paid in the tax years involved. *Cleaver* v. *Commissioner*, 158 Fed. (2d) 342, certiorari denied, 330 U. S. 849, affirming 6 T. C. 452. Whether termed discount, interest, or "bonus," the $1,500 difference between the principal amount of the loan and the amount actually received by the petitioner may not be deducted as "interest paid" in the year of borrowing. *Cleaver* v. *Commissioner, supra*. Upon repaying the $10,000 total sum due, however, petitioner should be entitled to an interest deduction of $1,500 in the year in which so paid. If, instead of repaying in a lump sum, petitioner, as here, should pay in installments, he should be entitled to an interest deduction upon the aliquot portion of each payment that is attributable to interest. Petitioner did not state in his testimony the amounts that

he actually repaid the lender in 1940 and 1941. He testified only very generally that he had made monthly payments on the loan amounting to "around 300 and some odd, I believe." Had such payments of $300 been consistently made each month, the $8,500 principal and the $1,500 "bonus" would have been repaid in slightly under three years instead of the 5-year period that was apparently required. From the fact that some of the payments were made by the bank as escrowee, it is probable that petitioner defaulted on his payments at some time in the early years. Although convinced that petitioner did make some payments in the tax years here involved, in the uncertain state of the proof as to the payments actually made, we can find no support for the amounts claimed in the petition or on brief. For lack of better evidence, we will allow petitioner the amount of $128.25 claimed on his 1941 income tax return as interest paid on this loan.

FACTS AS TO ISSUE 11—DEDUCTIBILITY OF REPAIRS ON YACHT.

In 1935, petitioner formed a Connecticut corporation under the name of the Sea Phantom Corporation to build and sell streamlined cabin cruisers with a new type bottom designed by petitioner to give the boat greater speed with minimum horsepower. Construction of the initial craft to employ this design was begun in a shipyard at Bridgeport. Connecticut. Because of labor conditions and overhead, petitioner determined to move operations to Florida. He leased a boatyard in West Palm Beach early in 1936 and had the hull brought down from Bridgeport. A full time secretary to handle office work, an engineer, two carpenters, a painter, a utility man and several helpers were employed in the boatyard. The secretary kept a set of books for the enterprise. The engineer was in charge of construction on the boat and was superintendent of the boatyard. The weekly pay roll for the boatyard approximated $275.

While the initial model was still under construction, petitioner took a booth at the New York motorboat show and advertised in the publication "Motor Boat." As a result of these advertising activities, he received several hundred letters of inquiry from all over the world. None of these inquiries, however, resulted in definite orders being placed for the Sea Phantom cruiser.

In October 1936, petitioner closed the boatyard in West Palm Beach and terminated the employment of the personnel working there. The cruiser Sea Phantom was in the early phases of completion at the time the boatyard was closed.

The boat was 48 feet long, was framed and double-planked in Philippine mahogany with the house decked in pine and tied in with cabin sides of mahogany, and with decks of teak wood. Accommodations for six persons, plus a crew of one, included a dining and living salon

with day bed type sofas and a radio-phonograph, an owner's stateroom and guest stateroom with twin beds and cedar-lined closets, bathtubs, showers, electric toilets, and a completely equipped galley with an electric refrigerator. It was powered by twin 130 horsepower Gray Marine engines giving a speed of 18 to 20 miles per hour. Its cost at completion was approximately $75,000.

The Sea Phantom Corporation was never registered in Florida either as a Florida corporation or as a foreign corporation licensed to do business in Florida. The corporation failed to pay taxes after 1936, forfeited its corporate license under Connecticut law and was dissolved for failure to file annual reports by the State of Connecticut in 1937. Petitioner learned in 1937 that the corporation no longer existed under the laws of Connecticut.

In April 1937, petitioner, in the capacity of managing owner, filed Department of Commerce Form 1270 (Oaths for Enrollment and License of Merchant Vessel or Yacht) stating that the twin gas screw yacht called the Sea Phantom was built in 1936 at West Palm Beach, Florida. Petitioner continued to use the name Sea Phantom Corporation after the Connecticut corporation was dissolved. In 1939, as president of the Sea Phantom Corporation, he advised the United States Customs Service that the two Gray motors of 130 horsepower each on the twin gas screw yacht Sea Phantom had been replaced with two Gray motors of 175 horsepower each, or a total of 350 horsepower.

After petitioner closed the West Palm Beach Boatyard, the Sea Phantom was stored in a boatyard at Daytona Beach, Florida. Petitioner discussed with N. L. Chadwick, president of the Daytona Beach Boat Works, Inc., the possibility of going into business together to build boats similar to the Sea Phantom, but no venture was ever undertaken as a result of this conference. Petitioner paid a total bill of $629.87 to the Daytona Beach Boat Works in 1939. Of this amount, a total of $599.52 represented repairs and maintenance performed upon the boat. In 1940, petitioner paid a total of $11,173.91 and in 1941 a total of $8,001.99 to the Daytona Beach Boat Works. Of the above amounts, $10,615.21 represented the cost of repairs and maintenance to the boat in 1940 and $7,601.89 in 1941. In 1941, petitioner also paid a total of $1,083.30 to Clive Merchant Co. of Lantana, Florida, for repairs, storage, and maintenance of the boat.

Petitioner continued to try to sell the Sea Phantom until war broke out in 1941. The boat was used by petitioner as a volunteer in the Coast Guard Auxiliary following the outbreak of the war. It was painted gray and used for patrol duty along the Florida East Coast. Petitioner attempted to sell it to the officer in charge of the Auxiliary Coast Guard unit in 1941 but was told that the unit's appropriations would not permit its purchase. When the Coast Guard Auxiliary unit

for this sector was broken up in 1942, the boat went into storage in the Clive Merchant Boatyard and was sold at a libel sale for storage and repair charges in 1943, being purchased for approximately $2,000 by the Clive Merchant Co. in satisfaction of its claims.

OPINION—ISSUE 11.

On this issue petitioner seeks to deduct for repairs made to the boat Sea Phantom the following amounts:

(1) $1,068.99 alleged to have been paid in 1939 to Daytona Beach Boat Works, Inc.;

(2) $19,175.98 alleged to have been paid on June 6, 1941, to Daytona Beach Boat Works, Inc.; and

(3) $1,083.30 alleged to have been paid in 1941 to Clive Merchant Co.

Petitioner's claim for deductions is based upon his asssertion that the Sea Phantom was part of a business venture entered into for profit, thus entitling him to deduct all ordinary and necessary expenses, including repairs, in connection with his business. Respondent attacks the business purpose and concludes that the expenditures for maintaining and repairing the Sea Phantom were purely personal expenditures incurred for petitioner's recreation or pleasure.

The record convinces us that petitioner originally embarked upon a business venture, intending to manufacture and sell stock boats of a new streamlined design conceived by him. For this purpose he formed the Connecticut corporation and built a test craft, the boat Sea Phantom. This conclusion is supported by petitioner's advertising campaign and by his lease of a West Palm Beach boatyard and his hiring of employees to build the craft. When, however, in 1936 he closed the boatyard, failed to pay taxes on the Connecticut corporation, and permitted the corporation to be dissolved for its failure to pay taxes and file reports, it appears evident that petitioner was no longer engaged in the business of manufacturing pleasure craft for a profit. Whatever may have been his projects or hopes for the future in building stock craft of the type of the Sea Phantom on which he had expended up to that time approximately $75,000, it appears evident that he had no facilities for undertaking such a venture. His discussion with Chadwick, president of the Daytona Beach Boat Works, Inc., in which he vainly sought to induce Chadwick to go in with him in the manufacture of these craft, clearly shows that petitioner at that time had but the hope of future enterprise. We cannot therefore sustain petitioner's contention that in the years here involved, 1939, 1940, and 1941, he was engaged in the business of manufacturing pleasure craft for a profit. Neither, however, does the record support respondent's determination that petitioner was using

the Sea Phantom for purposes of his own pleasure or recreation. The witnesses who testified as to the use of the boat all stated that they had never seen petitioner employ the boat for pleasure purposes but that he had used it for tests and for purposes of exhibiting it to prospective purchasers. Petitioner testified that he held the boat for sale until the outbreak of the war. We accordingly find that the boat Sea Phantom owned by the petitioner constituted property held for the production of income and that such repairs as petitioner has proved to have been incurred in the years in question are deductible as ordinary and necessary expenses paid "for the management, conservation, or maintenance of property held for the production of income", section 23 (a) (2), I. R. C.; Regs. 111, sec. 29.23 (a)–15.

On the question of the extent of the repairs, we have determined that petitioner paid to Daytona Beach Boat Works $599.52 in 1939, $10,615.21 in 1940, and $7,601.89 in 1941, representing the cost of repairs and maintenance performed on the Sea Phantom other than capital expenditures. We have also found that he paid $1,083.30 in 1941 to the Clive Merchant Co. for similar repairs and maintenance on the boat.

*Decision will be entered under Rule 50.*

