THE BROWN PAPER MILL COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 4882, 8200, 14590, 18774, 22948, 31167.    Filed October 15, 1954.

*Robert Ash, Esq., Carl K. Goodson, Esq., Charles H. Burton, Esq.,* and *L. J. Benckenstein, Esq.,* for the petitioner.
*Allen T. Akin, Esq.,* for the respondent.

## OPINION.

OPPER, *Judge:* Respondent determined deficiencies in petitioner's income and excess profits taxes and disallowed claims for relief under section 722 of the Internal Revenue Code of 1939 as follows:

| Year | Docket No. | Income tax | Excess profits tax | Claim for relief, sec. 722 |
|---|---|---|---|---|
| 1940 | 4882 | $12,845.34 | $70,665.10 | $399,689.21 |
| 1941 | 8200 | 19,853.83 | 78,793.53 | 1,174,911.88 |
| 1942 | 8200 | | 137,890.67 | 1,828,802.29 |
| 1943 | 14590 | | 219,928.10 | |
| 1944 | 18774 | | 100,475.43 | |
| 1945 | 22948 | | 73,655.08 | |
| 1943 | 31167 | | | 1,300,336.02 |
| 1944 | 31167 | | | 938,531.68 |
| 1945 | 31167 | | | 1,198,031.54 |

Petitioner also claims overpayments of income tax for the years 1942 through 1945, inclusive. Certain issues have been settled by stipulation; other adjustments are conceded by petitioner. The remaining questions are:

1. Whether petitioner is qualified for excess profits tax relief for all years in controversy because its average net income during the base period 1936 through 1939 is an inadequate standard of its normal earnings, due to (a) the depression of petitioner's business, or of the industry of which it was a member, during the base period by reason of temporary events or circumstances unusual to petitioner or to the industry of which it was a part, within the meaning of section 722 (b) (2); or (b) a change in the character of petitioner's business during or immediately prior to the base period, within the meaning of section 722 (b) (4).

2. If qualified for section 722 relief, whether petitioner has established a fair and just constructive average base period net income in excess of the credit to which it is entitled without reference to section 722.

3. Whether amounts totaling $238,573.81 paid pursuant to contract for 14 Sutherland pulp refiners in 1936, 1937, and 1938 and deducted during each of those years, should be eliminated as deductions in the computation of petitioner's base period net income and treated as payments for the acquisition of machinery and equipment, allowing only depreciation deductions for the base period years and for the years in controversy; or, if this acquisition is not a qualifying basis for reconstruction under section 722 (b) (4), whether it is an abnormal deduction during the base period within the meaning of section 711 (b) (1) (J) of the 1939 Code.

4. Whether respondent erred in treating sums of $180,000 and $220,000 paid in 1941 in settlement of deficiencies in petitioner's undistributed profits tax liability for 1936 and 1937 as deductible in those base period years, respectively, under section 711 (b) (1) (A), rather than as accrued and deductible in 1940 under section 711 (a) (1) (A).

5. Whether an addition to petitioner's capital stock tax for 1939 imposed by the Revenue Act of 1940 was properly accruable in 1940.

6. Whether petitioner is entitled under section 734, Internal Revenue Code of 1939, to an adjustment in 1939 income tax for certain amounts which were deducted in determining petitioner's base period net income credit for excess profits tax purposes for the years in controversy, but disallowed as ordinary deductions in 1939.

Extended findings of fact have been made and are filed as a part of the official record of the case. In order to give a general background of the facts, the following excerpts from such findings are set forth herein:

Petitioner is a corporation organized under the laws of Delaware in 1929. It succeeded a Louisiana corporation of the same name, hereinafter called Louisiana, in a reorganization in which no gain or loss was recognized under the Revenue Act of 1928. Petitioner maintains its principal office and business in Louisiana. Federal income and

excess profits tax returns were filed on its behalf for all years in controversy on an accrual basis with the collector of internal revenue for the district of Louisiana.

Petitioner filed applications for relief from, and for refund of, excess profits tax for each of the years in controversy with the Commissioner of Internal Revenue. Petitioner filed with respondent claims for refund of overpayment of income tax for the years 1942 through 1945.

Petitioner is entitled to use an excess profits tax credit based on income in computing its excess profits taxes for the years in controversy. The general average method of the 1939 Code, section 713, was used for the years 1940 and 1941. The 75 per cent rule of section 713 (e) was applicable for the years 1942 through 1945.

The tables below show the excess profits net income, net aggregate thereof, and average thereof for the base period years as adjusted and as finally determined by the respondent in his notices of deficiencies and disallowances for the taxable years 1940 through 1945:

| Excess profits tax years | 1936 | 1937 | 1938 |
| --- | --- | --- | --- |
| 1940 | $1,529,407.71 | $1,683,116.03 | $99,252.29 |
| 1941 | 1,973,577.55 | 2,186,548.84 | 99,668.63 |
| 1942 | 1,973,578.00 | 2,186,549.00 | 99,668.39 |
| 1943 | 1,973,578.00 | 2,186,549.00 | 99,668.00 |
| 1944 | 1,973,578.00 | 2,186,549.00 | 99,668.00 |
| 1945 | 1,973,578.00 | 2,186,549.00 | 85,272.00 |

| Excess profits tax years | 1939 | Aggregate | Average |
| --- | --- | --- | --- |
| 1940 | $499,953.71 | $3,811,729.73 | $952,932.43 |
| 1941 | 548,394.74 | 4,808,189.76 | 1,202,047.44 |
| 1942 | 548,394.49 | 4,808,189.76 | 1,202,047.47 |
| 1943 | 548,394.49 | 4,808,189.76 | 1,202,047.37 |
| 1944 | 548,394.49 | 4,808,189.76 | 1,202,047.37 |
| 1945 | 548,394.49 | 4,793,793.49 | 1,198,448.37 |

The excess profits credits based on income allowed by the respondent in his notices of deficiencies and disallowances are as follows:

| Excess profits tax years | Excess profits credits allowed by respondent in his 90-day letters | Excess profits tax years | Excess profits credits allowed by respondent in his 90-day letters |
| --- | --- | --- | --- |
| 1940 | $905,285.81 | 1943 | $1,397,842.32 |
| 1941 | 1,141,945.07 | 1944 | 1,397,842.32 |
| 1942 | 1,397,842.32 | 1945 | 1,397,842.32 |

The Yellow Pine Paper Mill Company, hereinafter referred to as Yellow Pine, located at Orange, Texas, was built primarily to use the refuse from sawmills. The founders of petitioner were substantial stockholders of Yellow Pine. Its operations were not very successful. H. L. Brown, petitioner's president, was made active vice president of Yellow Pine in 1918. This was his first active connection with paper manufacturing. As vice president of that company, he had total charge of its operations

In 1918, when Brown first became connected with the paper manufacturing industry, Yellow Pine was engaged in the manufacture of paper from southern pine wood by the sulphate process. The first pulping of southern pine by the sulphate process was in 1911, when Edward H. Mayo successfully made sulphate wood pulp at Orange, Texas. At that time, Yellow Pine was producing approximately 24 tons a day. After Brown had been with the company some little time, and after a very few additions had been made to the plant, the tonnage was increased to approximately 36 tons a day. Primarily, Yellow Pine manufactured wrapping paper and bag paper. Yellow Pine continued its operations until about 1929, when it closed down.

In 1923, Louisiana, petitioner's predecessor, was incorporated under the laws of the State of Louisiana. Brown was elected president of the newly organized corporation, and he and other members of his family were the largest and controlling stockholders in the company. It was planned to make kraft or sulphate paper for wrapping paper and bags.

During the years 1923–1924, Louisiana constructed a self-contained or integrated pulp and paper mill with a 3,000 kv-a electric turbo generator, a chemical recovery unit, and other facilities near West Monroe, Ouachita Parish, Louisiana. This mill was designed and engineered by George F. Hardy, a consulting engineer of New York City. It was designed for the manufacture of unbleached kraft pulp manufactured from southern pine wood by the sulphate process and unbleached kraft paper and kraft board. The mill was designed, engineered, and constructed to have a rated capacity, per 24 hours, of 60 tons of unbleached sulphate pulp and 60 tons of unbleached kraft paper or board.

Louisiana commenced the manufacture of unbleached kraft pulp and paper from southern pine wood and the sale of such paper at the mill in September 1924. About a year later it developed a kraft board which was added to its manufacturing and selling operations.

During 1926–1927, Louisiana made additions to the pulp and board producing and electric power generating facilities of the mill. The additions were designed and engineered by Hardy to increase the mill's rated capacity, per 24 hours, to 125 tons of unbleached sulphate pulp and 125 tons of unbleached kraft paper or board.

On June 1, 1926, Louisiana executed, in favor of the Continental & Commercial Trust & Savings Bank and Wm. P. Kopf, trustee, an indenture of mortgage and deed of trust securing an authorized issue of $4,000,000 first mortgage sinking fund serial 6 per cent gold bonds.

Contemporaneously with the execution of such mortgage and deed of trust, the company issued and sold, as of June 1, 1926, $2,500,000 (aggregate principal amount) of said bonds, maturing on June 1 of each of the following years for the following principal amount in

each year: $100,000 in each of the years 1929 to 1931, both inclusive; $125,000 in each of the years 1932 to 1934, both inclusive; $150,000 in each of the years 1935 to 1937, both inclusive; $175,000 in each of the years 1938 to 1940, both inclusive; and $850,000 in the year 1941. The foregoing $2,500,000 had been borrowed to make the 1926–1927 additions to the mill. These additions consisted of an additional paper machine and the additional pulp producing facilities needed to supply that paper machine with pulp, and an electric power generating unit needed to supply the electric power requirements of the additions.

Louisiana carried on the manufacture and sale of kraft paper and board until taken over by petitioner on August 1, 1929, on which date it was dissolved.

The amount of $854,015.90, representing the surplus of Louisiana at July 31, 1929, was transferred to petitioner, which company set it up as a part of its common stock account. In the reorganization, the common stockholders of Louisiana received 225,000 shares of no par common stock of petitioner in exchange for their common stock in Louisiana, and the preferred stockholders of Louisiana received 21,500 shares of preferred stock of petitioner in exchange for a like amount of preferred stock in Louisiana.

During the years 1929–1930, after the organization of petitioner, further additions were made to the pulp and paper or board producing facilities of the mill. These additions, consisting of 2 paper machines and additional pulp producing facilities, and 1 electric 6,000 kv-a turbo electric generating unit, were also engineered by George F. Hardy. They were designed to increase the mill's rated capacity, per 24 hours, to 350 tons of unbleached sulphate pulp and 350 tons of unbleached kraft paper or board. These additions were completed in 1930.

To finance the additions made in 1929–1930, petitioner, on August 21, 1929, issued and sold $1,500,000 (aggregate principal amount) of first mortgage sinking fund 6 per cent gold bonds, series B, authorized and secured by the indenture of mortgage and deed of trust which Louisiana had entered into with the Continental & Commercial Trust & Savings Bank of Chicago and Wm. P. Kopf, trustee, as of June 1, 1926; and a supplemental indenture of mortgage and deed of trust which petitioner executed to the Continental National Bank & Trust Company of Chicago (corporate successor of Continental & Commercial Trust & Savings Bank of Chicago) and Wm. P. Kopf, trustee. The supplemental indenture and deed of trust issued thereunder were dated as of June 1, 1929.

On August 21, 1929, petitioner issued and sold $3,000,000 (aggregate principal amount) of 6 per cent sinking fund convertible gold debentures dated as of July 1, 1929, and maturing July 1, 1939. These

debentures were secured by a trust agreement, dated as of July 1, 1929, which petitioner, on August 21, 1929, also executed in favor of the Continental National Bank & Trust Company, trustee.

On July 1, 1937, petitioner called and redeemed all outstanding debentures issued under the trust agreement with the Continental Illinois * Bank & Trust Company, trustee, dated July 1, 1929.

On October 21, 1938, petitioner borrowed $1,500,000 from the Bank of The Manhattan Company of New York. This indebtedness was evidenced by its promissory note for that sum payable in 5 installments of $300,000 each, maturing November 30 of each year beginning with November 30, 1939, with interest at 2¾ per cent per annum, and subject to a note agreement which the parties entered into contemporaneously therewith. This money was borrowed to pay off bonds issued at a higher rate of interest.

On October 31, 1938, petitioner called for redemption and payment on December 1, 1938, all outstanding bonds issued under the indenture of mortgage and deed of trust dated June 1, 1926, and supplemental indenture of mortgage and deed of trust of June 1, 1929.

On December 1, 1938, petitioner paid and redeemed all of the bonds in accordance with its call.

The particulars of borrowed capital during the base period years are as follows:

BORROWED CAPITAL—YEARS 1936–1939

| Balance | Change | Series A | Series B | Convertible 6 per cent sinking fund debentures | Notes payable | Total |
|---|---|---|---|---|---|---|
| Dec. 31, 1935 | | $1,507,000 | $1,150,000 | $2,449,000 | | $5,106,000 |
| | 1936 | | | | | |
| | June 1 | (150,000) | (29,500) | | | (179,500) |
| | December 1 | (43,500) | | | | (43,500) |
| | Various | | (2,500) | (12,000) | | (14,500) |
| Dec. 31, 1936 | | $1,313,500 | $1,118,000 | $2,437,000 | | $4,868,500 |
| | 1937 | | | | | |
| | January 1 | (3,500) | | | | (3,500) |
| | May 1 | | | (37,000) | | (37,000) |
| | June 1 | (150,000) | (72,000) | | | (222,000) |
| | July 1 | | | (2,400,000) | | (2,400,000) |
| | December 1 | (47,000) | | | | (47,000) |
| | Various | (2,000) | (4,000) | | | (6,000) |
| Dec. 31, 1937 | | $1,111,000 | $1,042,000 | | | $2,153,000 |
| | 1938 | | | | | |
| | April 1 | | (20,500) | | | (20,500) |
| | June 1 | (175,000) | (47,500) | | | (222,500) |
| | December 1 | (934,000) | (967,000) | | $1,500,000 | (401,000) |
| | Various | (2,000) | (7,000) | | | (9,000) |
| Dec. 31, 1938 | | | | | $1,500,000 | $1,500,000 |
| | 1939 | | | | | |
| | November 30 | | | | (300,000) | (300,000) |
| Dec. 31, 1939 | | | | | $1,200,000 | $1,200,000 |

* So stipulated.

As a result of the above mentioned financial changes, during and prior to the base period, petitioner's change in ratio of nonborrowed capital to total capital is indicated by the following table:

| | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| Average borrowed capital | $4,993,084 | $3,503,917 | $1,969,917 | $1,475,000 |
| Borrowed capital as of Dec. 31, 1939 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 |
| Decrease in borrowed capital | $3,793,084 | $2,303,917 | $769,917 | $275,000 |
| Average equity invested capital | $6,203,381 | $7,280,048 | $8,449,240 | $8,448,467 |
| Equity invested capital as of Dec. 31, 1939 | 8,579,489 | 8,579,489 | 8,579,489 | 8,579,489 |
| Increase in equity invested capital as of Dec. 31, 1939, over average equity invested capital for the year indicated | $2,376,108 | $1,299,441 | $130,249 | $131,022 |

The interest paid on the above borrowed capital and the amount of amortization of discount and expense (exclusive of discount and expense on bonds retired) deducted in petitioner's income tax returns and allowed by respondent for the years 1936, 1937, 1938, and 1939 are as follows:

| | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| Interest | $298,247 | $209,772 | $113,703 | $40,562 |
| Amortization of discount and expense incurred in the issuance of the bonds | 47,246 | 31,346 | 14,426 | 0 |
| | $345,493 | $241,118 | $128,129 | $40,562 |

The following table reflects the extent to which petitioner is entitled to an adjustment in its interest deduction for the base period under section 722 (b) (4):

| | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| 1. Average borrowed capital | $4,993,084 | $3,503,917 | $1,969,917 | $1,475,000 |
| 2. Borrowed capital as of Dec. 31, 1939 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 |
| 3. Decrease in borrowed capital | $3,793,084 | $2,303,917 | $769,917 | $275,000 |
| 4. Average equity invested capital | $6,203,381 | $7,280,048 | $8,449,240 | $8,448,467 |
| 5. Equity invested capital as of Dec. 31, 1939 | 8,579,489 | 8,579,489 | 8,579,489 | 8,579,489 |
| 6. Increase in equity invested capital as of Dec. 31, 1939, over average equity invested capital for the year indicated | $2,376,108 | $1,299,441 | $130,249 | $131,022 |
| 7. Recognized decrease in borrowed capital | $2,376,108 | $1,299,441 | $130,249 | $131,022 |
| 8. Actual interest paid on borrowed capital | 298,247 | 209,772 | 113,703 | 40,562 |
| 9. Average interest rate lines (8)÷(1) | 5.97% | 5.99% | 5.77% | 2.75% |
| 10. Interest deduction adjustment lines (9)×(7) | $141,854 | $77,837 | $7,515 | $3,603 |
| 11. Add: Amortization | 47,246 | 31,346 | 14,426 | 0 |
| 12. Total | $189,100 | $109,183 | $21,941 | $3,603 |

At all times prior to and during the base period years, petitioner engaged in the business of manufacturing and selling unbleached kraft bag and wrapping paper, corrugating material, and container board, which it manufactured at its mill at West Monroe, Louisiana, from southern pine wood by the sulphate process.

During the base period years and those here involved, petitioner obtained its supplies of pine wood for pulp from forests located in the States of Arkansas, Louisiana, and Mississippi.

Sulphate or kraft pulp is made by a process developed from the soda process in 1883 and first used in the United States about 1907. The sulphate process is adapted to pulping most species of wood, including resinous coniferous woods, for which the sulphite and soda processes are not generally employed. The sulphate process is used chiefly for pulping southern pine and jack pine, and to some extent hemlock, balsam fir, Douglas fir, and spruce.

An expansion in kraft production in the South occurred during the years 1936, 1937, and 1938. In 1936 one additional sulphate paper and board mill went into operation. Eleven additional sulphate pulp, paper, and board mills went into operation in the years 1937 and 1938.

The construction of new kraft mills in 1936 to 1939 was not a temporary condition. A paper mill is permanent, requiring a large investment, and once set up is intended to last a long time.

The growth in the capacity to produce paper and paperboard during the years 1936 to 1939 was not unusual in the history of the paper industry. The growth in the total capacity of paper machines, which is the best measure of capacity, during the period 1935 to 1939 was approximately 2½ million tons. Percentagewise this was not an extraordinary growth for a 4-year period. Several other 4-year periods were greater or nearly equal. 1909 to 1914 shows a greater percentage gain than shown in the period 1935 to 1939. The growth in capacity for production of paper and paperboard during the period 1936 to 1939 was about normal.

The base period expansion in bag and wrapping paper production capacity was not an extraordinary expansion. During the years 1925 to 1929 expansion in wrapping paper and bag production was 24.9 per cent while during the base period it was 26.9 per cent. In paperboard production (capacity) the expansion from 1925 to 1929 was 29 per cent and in the base period it was 27 per cent.

Kraft test liner prices, per ton, in the New York territory, by months, with respect to the years 1936, 1937, 1938, and 1939, were as follows:

| Month | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| January | $57.50 | $57.50 | $55.00 | $42.50 |
| February | 55.00 | 57.50 | 55.00 | 42.50 |
| March | 55.00 | 57.50 | 52.50 | 42.50 |
| April | 57.50 | 60.00 | 50.00 | 45.00 |
| May | 57.50 | 60.00 | 50.00 | 45.00 |
| June | 60.00 | 60.00 | 50.00 | 45.00 |
| July | 60.00 | 60.00 | 42.50 | 45.00 |
| August | 60.00 | 60.00 | 42.50 | 45.00 |
| September | 60.00 | 55.00 | 42.50 | 45.00 |
| October | 57.50 | 55.00 | 42.50 | 50.00 |
| November | 57.50 | 55.00 | 42.50 | 55.00 |
| December | 57.50 | 55.00 | 40.00 | 55.00 |
| Average | $57.92 | $57.71 | $47.08 | $46.46 |

The wholesale price index for all commodities during the years 1936, 1937, 1938, and 1939, expressed by means of an index with the year 1926=100, discloses the following:

| | |
|---|---|
| 1936 | 80. 8 |
| 1937 | 86. 3 |
| 1938 | 78. 6 |
| 1939 | 77. 1 |

During this period the price of the finished fabricated shipping container that the container manufacturer was producing and selling did not decrease accordingly.

The converters who were converting sulphate board into boxes added to their equipment in 1938 and 1939. Also, new fabricators built plants. These additional production facilities of the fabricators came in a year or less. During the period of 1937 to 1939 the converters were taking on more kraft products than they had in the earlier period. The entire growth of kraft paperboard production was continuing.

A comparison of the Federal Reserve indices of industrial production, petitioner's combined production, and sulphate pulp production, during the period from 1927 through 1939, expressed by index numbers with 1935–39 average=100, shows that sulphate pulp production had a generally steady growth with minor exceptions in 1934. It also shows that petitioner's combined production grew rapidly with a minor decline in 1938. Contrasted with these, industrial production in general shows some decided variations. In 1938, the industrial production generally fell off decidedly more than did that of petitioner, and in contrast to sulphate pulp production which showed a decided growth.

A comparison of industrial production in general, mill production of kraft liners and corrugated board, in tons, kraft paper total production, in tons, and petitioner's combined production, in tons, for the years 1936, 1937, 1938, and 1939, expressed by index numbers with 1935–39 average=100, discloses an increase in mill production of kraft liners and corrugating boards from 85 in 1936 to 140 in 1939. The increase in mill production of kraft liners and corrugating boards, as aforesaid, was fairly steady.

A comparison of the relationship of average monthly production to new orders and unfilled orders of paperboard generally emphasizes the close relationship that exists between new orders and production. Petitioner's industry does not accumulate large inventories. New orders and production move hand in hand. In 1938, unfilled orders were down to a negligible level.

Paper machines can produce more paperboard than wrapping paper or bag paper.

One measure of a paper machine's capacity is its drying capacity. The installation of additional dryers would increase the production of a paper machine. If there is sufficient drying capacity, the speed of the machine or the weight of the product manufactured would govern its production.

In making paper, a paper machine rarely runs to its full drying capacity, and, on a very light weight of paper, the machine cannot be run fast enough to overtax the drier. But in making board, the paper machine is usually run to its full drying capacity.

A machine has unused capacity if the reason for the lost time is because there is nothing for it to make.

The amount of kilowatt hours of power required to manufacture paper varies from that required to manufacture board. For the years 1936 to 1939, it took about $1\frac{7}{10}$ times as much power to refine paper as it did to refine board.

Direct labor costs of petitioner in the base period years were as follows:

| Year | Tons produced | Hourly man hours | Employees total of hourly payroll | Balance including supervisory employees paid monthly and sundry | Total direct labor cost |
|------|------|------|------|------|------|
| 1936 | 162, 761 | 1, 414, 293 | $721, 770 | $55, 028 | $776, 798 |
| 1937 | 168, 742 | 1, 425, 511 | 797, 766 | 26, 991 | 824, 757 |
| 1938 | 155, 614 | 1, 313, 166 | 789, 901 | 26, 723 | 816, 624 |
| 1939 | 186. 698 | 1, 390, 647 | 857, 112 | 28, 484 | 885, 596 |

In 1939, petitioner discontinued the Swenson type washer and placed into operation 5 McDonald dehydrators. Petitioner was the first mill to install McDonald dehydrators. They were installed at intervals during the period from January to July 1939. The McDonald dehydrator is a pressure type washer. It is named after its inventor, Manuel C. McDonald, a former vice president and general manager of petitioner. Petitioner paid all costs for experimenting and building the McDonald dehydrator.

The McDonald dehydrator is different in method from any other process of pulp washing.

The McDonald dehydrator enabled petitioner to increase its chemical savings considerably. It enabled petitioner to save a great deal of sodium sulphate, which is the primary chemical used in the sulphate process.

Rosin is used in the manufacture of pulp and paper as a sizing agent to give the paper and board the degree of waterproofing that is desired. Rosin is the sticky substance found in the rosin ducts of the pines and certain softwoods. Alum is used in the manufacture of pulp and

paper to acidify the water to a degree sufficient to cause the rosin to adhere to the pulp fibers or to "precipitate the rosin size." The customer's order affects the amount of sizing used.

The McDonald dehydrator, as compared with the Swenson vacuum washer in 1936, 1937, and 1938, enabled petitioner to reduce its alum in size because the pulp was cleaner. It did not take as much rosin or alum to get the same degree of waterproofing in the sheet of paper or board. Cleanliness depends on the soda content of the pulp. If the stock or pulp is heavily laden with soda, it takes more size and more alum to give a degree of waterproofing as compared to a clean pulp or a pulp that is much reduced in soda content.

The average consumption, per ton of product, of chemicals by petitioner during the last 6 months of 1939 was as follows:

| Month | Tons of salt cake usage per ton of pulp | Pounds of rosin usage per ton of pulp | Pounds of lime usage per ton of pulp | Pounds of alum usage per ton of paper | Gallons of distillate usage per ton of pulp |
|---|---|---|---|---|---|
| July | 0.169480 | 10.600 | 93.30 | 46.90 | 1.15 |
| August | 0.141647 | 11.000 | 100.00 | 48.40 | 1.60 |
| September | 0.156933 | 9.400 | 90.30 | 47.37 | 0.57 |
| October | 0.147892 | 10.100 | 68.20 | 49.90 | 0.92 |
| November | 0.156205 | 9.600 | 113.22 | 53.20 | 1.35 |
| December | 0.150384 | 10.030 | 73.00 | 57.10 | 1.56 |
| Total | 0.922541 | 60.730 | 538.02 | 302.87 | 7.15 |
| Average | 0.153757 | 10.122 | 89.67 | 50.48 | 1.19 |

As of January 1, 1936, petitioner had one 3,000-kilowatt Westinghouse generator and two 6,000-kilowatt General Electric generators, all 3 being driven by steam turbines. Petitioner did not install any additional electric generating capacity during the base period. The entire mill was serviced by the foregoing electric power generating facilities. A kilowatt is a rate of power flow equal to 1,000 watts. A kilowatt hour is a measurement of power flow and represents 1 kilowatt flowing for a period of 1 hour. As of January 1, 1936, the function of the steam turbines was as prime movers of the 3 generators.

Based on petitioner's actual production of 162,760.70 tons of paper and board in 1936, and its actual total consumption of 130,364,952 kilowatt hours of power in 1936, and assuming a 365-day operation in 1936, generating capacity of petitioner's plant was up to rated capacity. The figure of 130,364,952 actual kilowatt hours consumed by petitioner in 1936 divided by 8,760 hours (the total number of hours in a 365-day year) results in 15,000-kilowatt rate of power generation on the 3 generators which had a combined capacity of 15,000 kilowatts.

As of January 1, 1936, and for the years prior thereto, petitioner used the Miami Jordan pulp refiner, hereinafter referred to as Jordan, in the refining phase of its operations.

When it was brought to the attention of petitioner that there was a new pulp refiner, the Sutherland, for which it was claimed that it would refine pulp for less power, petitioner's plant superintendent went to New Jersey to inspect it. Petitioner shipped some of its pulp to New Jersey for experimental runs. The plant superintendent returned from New Jersey with the definite idea that petitioner should make use of the new Sutherland pulp refiner. The Sutherland refiner had never before been used on southern pine. It was decided to obtain the use of the Sutherland refiners.

On August 30, 1935, petitioner and Sutherland entered into a lease and licensing agreement, whereby, among other provisions, petitioner was given the exclusive right, privilege, and license to use the processes and apparatus described in the Sutherland patents and applications for patents for pulp refining in the refining of sulphate pulp for a period of 1 year from the date of the commencement of actual commercial operation of the refiners.

On March 11, 1936, petitioner and Sutherland entered into an agreement whereby, among other things, Sutherland granted to petitioner the exclusive right to use the processes and apparatus described in the Sutherland patents and applications for patents for pulp refining in the refining of sulphate pulp and also agreed to furnish for lease, upon petitioner's order, any number of pulp refiners built in accordance with his patent.

On October 1, 1942, petitioner entered into an agreement with Sutherland, et al., trustees, in which petitioner released certain exclusive rights granted it under earlier contracts and acquired title to the machines.

In 1936, the Jordan pulp refiners were used exclusively by petitioner on No. 1, No. 2, and No. 3 paper machines, and they were also used exclusively ahead of No. 4 paper machine through September 1936. Two Sutherland refiners were placed ahead of No. 4 paper machine in October 1936. No. 4 paper machine in 1936 was a cylinder machine on which heavy tonnage of board was made.

In 1937, the Jordan pulp refiners were used by petitioner on both No. 1 and No. 3 paper machines through October, and they were used on No. 2 paper machine through May.

Jordan pulp refiners were used by petitioner in the machine room in both 1938 and 1939. However, as of December 31, 1939, petitioner did not own any Jordan pulp refiners. Petitioner discontinued the use of its 24 Miami Jordans in its pulp refining operations and sold 22 of said Jordans during 1938 and 1939.

As of December 31, 1939, petitioner had 14 Sutherland pulp refiners ahead of its 4 paper machines. The first time it had 14 Sutherland

refiners in operation ahead of its 4 paper machines was in October 1939.

Beginning in March 1936, and continuing each month through October 1937, and in each month from November 1938, through September 1939, petitioner used either 1 or 2 Sutherland refiners on experimental work, as distinguished from operating in front of a paper machine.

Beginning in August 1936, and continuing each month throughout 1937 and 1938 and through July 1939, petitioner had as low as 2 and as high as 6 Sutherland refiners on brown stock, as distinguished from operating in front of a paper machine. These Sutherland refiners were located in the washroom and were used to refine the stock after it came from the digesters and before washing.

The Sutherland refiner works on a piece of fiber in an entirely different way than the Jordan refiner. The latter acts as a cutting piece of equipment, and the former acts as a bruising or crushing piece of equipment. The principle of the Sutherland refiner is entirely different from that of the Jordan.

If petitioner had the productive capacity that it actually had, as of December 31, 1939, and whether or not petitioner had installed the Sutherland refiners and the McDonald dehydrators 2 years earlier than they were actually installed, petitioner could have operated in each of the years 1936, 1937, and 1938 at the same capacity it did during the last of 1939.

The growth of paper mills in the years 1936 to 1939 was not unusual, but was about normal for a 4-year period.

Neither petitioner's business nor that of the industry of which it was a member was depressed in the base period years 1936 to 1939 because of any temporary economic event or circumstance, unusual in its history or that of its industry.

The installation of Sutherland refiners without the additional dryers would not have increased petitioner's production.

The installation of the Sutherland refiners by the Brown Paper Mill in the years 1936 to 1939 did not increase petitioner's capacity for production in those years.

Petitioner did not make a timely claim for relief for the year 1940 on account of a change in the ratio of nonborrowed capital to total capital.

Petitioner's average base period net income as determined by the income credit method is an inadequate standard of normal earnings, resulting in an excessive and discriminatory excess profits tax for each of the taxable years in controversy.

The difference in the ratio of petitioner's nonborrowed capital to total capital, during the base period, is a change in the character of

petitioner's business under section 722 (b) (4) of the 1939 Code, and is a qualifying event leading to a reconstruction of petitioner's base period earnings.

The installation, during the base period, of the Sutherland pulp refiners is a change in the method of operation of petitioner's business under section 722 (b) (4) of the 1939 Code, and is a qualifying event leading to a reconstruction of petitioner's base period earnings.

The installation, during the base period, of the McDonald dehydrators is a change in the method of operation of petitioner's business under section 722 (b) (4) of the 1939 Code, and is a qualifying event leading to a reconstruction of petitiouer's base period earnings.

Petitioner's actual base period net income, as determined by respondent, is an inadequate standard of normal earnings by reason of the change in its ratio of nonborrowed to total capital and the change in the operation of its business. To arrive at the constructive average base period net income, the following amount is to be added for each of the base period years to the actual base period income as appropriately adjusted:

| | |
|---|---|
| Change in capital ratio | $80, 957 |
| Change in method of operation | 250, 860 |
| Total | $331, 817 |

In consideration for the 14 Sutherland pulp refiners received from Sutherland, petitioner, in accordance with the provisions of the aforesaid contracts, paid to Sutherland the aggregate sum of $238,573.81 as licensing fees for their use.

Petitioner claimed, and respondent allowed, the following amounts which were deducted in petitioner's income tax returns for the years 1936, 1937, and 1938 under the caption of "Lease and Licensing Fees, Pulp Refiners":

| Year | Amount |
|---|---|
| 1936 | $47, 205. 33 |
| 1937 | 143, 064. 53 |
| 1938 | 48, 303. 95 |
| Total | $238, 573. 81 |

The amounts paid by petitioner for leases and licensing fees for the use of the Sutherland refiners in 1935, 1936, and 1937 were amortized on petitioner's books over a period of 12 months from the date of installation. No depreciation deduction was claimed on petitioner's returns for these refiners or allowed for the years 1940 through 1945.

Petitioner did not acquire title to, or ownership in, the Sutherland refiners until 1942.

The amounts paid in 1936, 1937, and 1938 as lease and licensing fees for the use of the Sutherland refiners were properly expensed and did not represent cost of a depreciable asset.

Petitioner paid to the collector of internal revenue at New Orleans, Louisiana, on February 10, 1941, the amounts of $180,000 and $220,000 in settlement of deficiencies in income tax and surtax on undistributed profits for the years 1936 and 1937, respectively, with interest thereon. These taxes were paid pursuant to a decision of the United States Board of Tax Appeals, Docket No. 102390, entered on February 14, 1941, pursuant to written stipulation signed by counsel for petitioner and the Commissioner of Internal Revenue.

Petitioner paid on July 31, 1940, to the collector of internal revenue at New Orleans, Louisiana, as capital stock tax for the year ended June 30, 1940, the amount of $30,250 on $27,500,000 elective declared value of capital stock at the effective rate of $1.10 per each full $1,000 of declared value.

Petitioner deducted on its income tax returns, and was allowed as a deduction for the year 1939, the amount of $20,462 in respect of the capital stock tax for the year ended June 30, 1940.

Petitioner showed in its capital stock tax return for the year ended June 30, 1940, an adjusted declared value for its capital stock of $20,136,546.16, but elected to declare in its return for that year an elective declared value of $27,500,000, and paid its capital stock tax on the latter amount.

Respondent erred in failing to allow as a deduction for the year 1940 the amount of $2,750, representing the defense tax applicable to capital stock tax for the year ended June 30, 1940, which petitioner paid to the collector of internal revenue at New Orleans, Louisiana, on or before July 31, 1940.

Respondent further disallowed the amount of $7,038.51, representing capital stock tax accruable and paid for the year 1939.

Relief Under Section 722.

Petitioner claims that a number of qualifying events under section 722 (b) (2) and (4) [1] justify a reconstruction of its base period earn-

[1] Internal Revenue Code of 1939.

SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory * * * if [the taxpayer's] average base period net income is an inadequate standard of normal earnings because—

* * * * * * *

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

* * * * * * *

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the

ings. Apart from establishing these qualifying events, petitioner must also provide a basis from which we may determine a fair and just amount representing such reconstructed earnings. Unless an amount may be thus established in excess of the credit as otherwise computed by respondent,[2] no relief should be granted under section 722. *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220.

### I. *Change in Capital Ratio Under 722 (b) (4).*

Respondent concedes that petitioner qualifies for relief in the years 1941 through 1945 under section 722 (b) (4) because of a change in its ratio of nonborrowed capital to total capital which occurred during the base period, but challenges the amount of petitioner's reconstruction for those years and the availability of any relief for the year 1940. Petitioner's claim for refund for that year did not specifically claim relief because of the change in its capital ratio.

Respondent takes the position that the conference memorandum filed in 1945 contained the earliest claim of this ground for relief as to 1940, and that even if that memorandum were construed as an amendment to the original claim, it was then barred by the statute of limitations. Petitioner does not deny that the statute of limitations barred the assertion of new grounds for relief for 1940 prior to the filing of its conference memorandum. But it contends that the only ground for relief which it was required to claim under respondent's regulations at the time its original application was filed[3] in

---

business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purpose of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, * * *

[2] Certain adjustments in actual base period earnings have been allowed by respondent under section 713 (e) (1), in computing the credit for the years 1942 through 1945. Any reconstructed credit must exceed actual earnings as adjusted under section 713 before relief may be granted under section 722 for these years, as petitioner may not avail himself of both sections. *Stimson Mill Co.*, 7 T. C. 1065, affd. (C. A. 9) 163 F. 2d 269, certiorari denied 332 U. S. 824; *Dowd-Feder, Inc.*, 10 T. C. 345, affd. (C. A. 6) 173 F. 2d 673.

[3] Regulations 109, section 30.722–5 (*a*), prior to its amendment in November 1945 but after May 1943, read in part as follows:

the application for relief shall set forth in detail and under oath e' :h ground under section 722 upon which the claim for relief is based, and facts sufficient to apprise the Commissioner of the exact basis thereof. *The mere statement of the provision or provisions of law under section 722 upon which the claim for relief is based shall not constitute an application for relief within the meaning of section 722.* * * * If it is not possible for the taxpayer prior to September 16, 1943, to obtain, prepare, and present ªll the *detailed information* required to *establish its eligibility* for relief and the amount of its constructive average base period net income, *such information* may be submitted within a reasonable time *after filing the applicatⱼᵤn* as a supplement to the application. *No new grounds* presented by the taxpayer after September 15, 1943, *will be considered* in determining eligibility for relief or the amount of the constructive average base period net income to be used in computing such relief for taxable years beginning in 1940 or 1941. [1943 C. B. 761, 786. **Emphasis added.**]

September 1943 was a "change in the character of the business"; that the specific facts relating to a change in its capital ratio are merely detailed evidentiary matter in support of its timely statutory ground, rather than a ground in themselves; and that such detailed information, contained in its June 1945 conference memorandum together with information to support allegations of increased capacity and change in method of operation, was presented within the "reasonable time" after the filing of the original application which is allowed by the regulations for the furnishing of such material.

Congress has seen fit to specify a change in the ratio of nonborrowed to total capital as a specific qualifying change in the character of a business for purposes of section 722 (b) (4). It is difficult to conceive that such a claim should be classified as mere "evidentiary matter," rather than a qualifying ground which the regulation, as amended in May 1943, required to be claimed on the appropriate claim form within the time specified by the statute of limitations. The evidence indicates that petitioner so treated the application in 1945. In 1943, it had filed a claim on Form 991 simultaneously for each of the years 1940 and 1941. These claims contained substantially identical allegations of grounds for relief; neither mentioned a change in capital ratio as such a ground. But in March 1945, just before the statute of limitations expired on the 1941 claim, but after it had expired for amending the 1940 form, the 1941 application [4] was amended as required by the regulations, and petitioner used the following language:

Without waiving any of the several grounds set forth in its application for relief under section 722 * * * your applicant asserts *as an additional ground for relief* under sub-section (B)–(4) of said section 722, the difference in the ratio of its non-borrowed capital to its total capital during and immediately prior to the base period. [Emphasis added.]

In view of the language of the regulations as it existed when petitioner first filed its claim for 1940, and its own conduct with respect to its application for the year 1941, we are satisfied that its claim as filed for 1940 is insufficient to support a claim for qualification for relief in that year because of a change in capital ratio during the base period. Respondent properly refused to entertain such a claim. See *Angelus Milling Co.* v. *Commissioner*, 325 U. S. 293, affirming (C. A. 2) 144 F. 2d 469, which affirmed 1 T. C. 1031; *Hummel & Downing Co.*, 21 T. C. 231.

---

[4] T. D. 5393, approved July 21, 1944, amended the last sentence of the section of Regulations 109 quoted in footnote 3, *supra,* to read as follows:

No new grounds presented by the taxpayer after the period of time for filing a claim for credit or refund prescribed by section 322 will be considered in determining whether the taxpayer is entitled to relief or the amount of constructive average base period net income to be used in computing such relief for a taxable year. [1944 C. B. 415, 421.]

This permitted the amendment of the 1941 application which would otherwise have been barred by the superseded language of the regulation; but it apparently came too late for the terms of the new provision to permit an amendment of the 1940 claim.

And as to the years for which petitioner is concededly entitled to benefit from its qualification for a change in capital ratio, respondent in some respects properly modified the proposed reconstruction. The governing regulations [5] require that reconstruction be allowed only to the extent that retired borrowed capital is offset by a corresponding increase in equity invested capital during the base period. This limitation petitioner has not observed. But it does not question the propriety of such an adjustment which must accordingly be made in petitioner's reconstruction. *Jefferson Amusement Co.*, 18 T. C. 44, 53, 63.

Although it is not entirely clear that the parties are in disagreement, the rate of interest to be used in computing the interest adjustment should likewise be the actual rate in effect in each year. Petitioner seeks to have disallowed interest deductions for each base period year by the extent to which those actual deductions exceed the interest computed at the rate it was paying on December 31, 1939, notwithstanding it was paying only the lower rate after October 1938.[6] We think that a reconstruction for each year on the actual permissible reduction in borrowed capital and on the basis of actual effective rates in each year is both necessary and appropriate to accomplish the remedial purpose of the statute. See *Foskett & Bishop Co.*, 16 T. C. 456, 463.

Petitioner seeks to adjust certain amortization expense deductions as the functional equivalent of interest as a part of its reconstruction under section 722 (b) (4), on the ground that these amortization expenses are the reciprocal effect of variations in interest rates. Respondent contends that the governing regulations [7] refer solely

---

[5] "For the purposes of section 722 (b) (4) a difference in the ratio of nonborrowed capital to total capital does not obtain merely because borrowed capital has been reduced or because equity invested capital has been increased. Such difference arises only when there is a decrease in borrowed capital offset by a corresponding increase in equity capital. In such event the amount of interest, on borrowed capital so retired during the base period, which has been deducted in computing average base period net income shall be disallowed as a deduction in computing constructive average base period net income. For the purposes of the preceding sentence, the amount of borrowed capital retired during the base period shall be limited to the increase in equity invested capital (whether by amounts paid in for stock, as paid-in surplus, or as contributions to capital, or by the amount of accumulated earnings and profits) for such period." (Regs. 112, sec. 35.722–3 (*d*) (4).)

[6] Since respondent does not question the propriety of the higher interest deductions, this is not a proper case for the adjustment of the base period year returns under section 734.

[7] E. g., "* * * If a taxpayer operated during the base period in whole or in part on borrowed capital, the interest paid or accrued on such capital would be a deduction in computing average base period net income. If during the base period borrowed capital was reduced so that at the end of its base period the interest deduction was reduced, deductions for interest during the base period would be greater than such deductions during the excess profits tax taxable years. If the total capital at the end of the base period was as large as or larger than the total capital prior to the reduction of the borrowed capital, the average base period net income, to the extent that it was reduced by the interest deduction, would furnish an inadequate standard for determining excess profits. * * *" (Regs. 112, sec. 35.722–3 (*d*) (4).)

and specifically to interest in the technical sense, as it is generally understood. But any claim of abnormality in earnings due to variations in amortization expenses when coupled with a showing of reduction in borrowed capital is not an independent ground for qualification under section 722 (b) (5).[8] Cf. *Clinton Carpet Co.*, 14 T. C. 581. And while the regulations specify interest they do not in terms exclude comparable deductions directly attributable to the borrowed capital, and their reasoning applies equally to such related deductions as discount. See *C., R. I. & P. Railway Co.*, 13 B. T. A. 988, 1027–1034, reversed on other grounds (C. A. 7) 47 F. 2d 990, certiorari denied 284 U. S. 618; *John Randolph Hopkins*, 15 T. C. 160, 180. In this respect we think petitioner's reconstruction should be approved.

## II. *Temporary Economic Events Under 722 (b) (2).*

Petitioner contends that an unprecedented increase in the number of southern kraft mills at the beginning of the base period so greatly outran a corresponding expansion among the independent converters and fabricators of paper and board, upon whom kraft producers were dependent for the processing and distribution of their products, that the resultant "bottleneck" in distribution, which it claims lasted from about the beginning of 1938 through the middle of 1939, qualified under section 722 (b) (2) as a temporary economic circumstance, unusual both in the case of this petitioner and in the case of the southern kraft industry of which it claims to be a member, which depressed its earnings and those of other kraft producers during the base period so as to make them an inadequate standard of normality.

That there was a substantial increase in the number of southern kraft producers before and during the base period is not in dispute. Respondent contends, however, that the number of kraft producers had expanded steadily and continuously since the mid-1920's; that this expansion was permanent in nature; and that any lag in the increase of converting facilities was a "not unusual readjustment" which brought about no more than an ordinary keenness of competition in-

---

[8] Internal Revenue Code of 1939.

SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory * * * if [the taxpayer's] average base period net income is an inadequate standard of normal earnings because—

* * * * * * *

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

sufficient to qualify under section 722 (b) (2) as an unusual economic circumstance. Respondent asserts that the industries to which petitioner belonged within the meaning of section 722 (b) (2) were the paperboard, and the wrapping and bag paper segments of the over-all pulp and paper products industry; that these segments included producers of jute board and paper, northern kraft producers, strawboard producers, and those sulphite producers whose products were converted into wrapping and bag paper; and that neither of these two segments was depressed during the base period, in terms of either net earnings or production, to any degree beyond the general recession affecting the entire economy during the 1937–1939 period. Finally, respondent asserts that petitioner's average earnings during the base period in fact exceeded its long-term average earnings, and that its base period ratio of profit to net worth and sales also equaled or exceeded its long-term profit ratio, thus precluding a finding of depressed base period earnings under cases such as *Industrial Yarn Corporation,* 16 T. C. 681, and *Foskett & Bishop Co., supra.*

The large influx of southern kraft mills in 1935 and 1936 was concededly a permanent economic development. But it is the resultant "bottleneck" in distribution which petitioner claims as its basis for qualification under section 722 (b) (2).

The claim is first, that petitioner's low income—or loss—in 1938 and 1939 was due to depressed prices; second, that such depressed prices were due to two simultaneous events, an unprecedentedly sharp increase ·in sulphate paper and board production and a lack of corresponding increases in the processing capacity which could handle those increases; but that, third, only the latter situation was temporary; although, fourth, the proof that the price level was not in a permanently declining trend is furnished by the continued high consumption of sulphate products even during the period of depressed prices.

The fatal weakness in petitioner's contention seems to lie just here. Actually, the average selling price per ton received by petitioner for its liner board was lower ($33.79) in 1939 than in 1938 ($34.91), although from one year to the next a small loss had been converted to a substantial net income. Petitioner does not in computing its reconstruction—and in fact could not under the statute—show that more processing facilities arose or higher prices were restored after 1939.[9] Yet without that there is no basis for a finding that the described

---

[9] The most that is shown is such figures as the growth in "Domestic Production of Kraft Container Board." But these are evidence of a steady and gradual growth, by no means consistent with either a "temporary" or "unusual" characterization. For example, it is shown that from 1935 to 1937 production of kraft liner board, presumably in tons, rose from 552,200 to 752,400, an increase of about 37 per cent, and by 1939 to 1,083,600, a further increase of about 44 per cent.

situation was "temporary."  As in *Hummel & Downing Co., supra*, 21 T. C., at 236, 238:

The earnings of the taxpayer during 1938 and 1939 were unusually low and may fairly be regarded as an inadequate standard of normal earnings.  The petitioner has attempted to show that the direct cause of those low earnings was a depression resulting from the temporary overexpansion of kraft pulp capacity or perhaps of the kraft paper board industry.

The difficulty of segregating and measuring the effect upon the petitioner's * * * 1938 and 1939 earnings of any temporary excess of expanded kraft pulp or kraft liner board capacity from late 1937 to late 1939 over the expanded production of or demand for those products during that same period is obvious. * * *

The petitioner, in making those computations, has made too many assumptions too favorable to itself * * *

For all that appears from the present record, prices would have remained low—and in fact might well have been the economic cause for increased consumption.  Only greater efficiency and lower costs of production and operation could save an industry in such a predicament.  And these expedients, the record shows, were being successfully employed by petitioner to save its economic life as the base period came to a close.  For those changes, to the extent permissible, we are giving petitioner credit in the reconstruction.

The correct analysis seems to be that the general business depression, coupled simultaneously with great increases in capacity in petitioner's industry, caused a drop in prices which, except for the war, would have been neither temporary nor unusual; and that the highly profitable operations previously carried on by petitioner and its competitors were the occasion, under our economic system, first for new entrants into the field and then for resort to greater efficiency on the part of all.  This is to be expected in our economy and neither a mere period of depression, *Industrial Yarn Corporation, supra*, nor intense competition, *Harlan Bourbon & Wine Co.*, 14 T. C. 97; *Winter Paper Stock Co.*, 14 T. C. 1312; *Lamar Creamery Co.*, 8 T. C. 928, qualifies petitioner for relief under section 722.

In this view it becomes unnecessary to decide whether, as petitioner contends, the southern kraft producers were a separate industry.  Neither such industry, if any, nor petitioner has been shown to be the victim of temporary or unusual economic events or circumstances.

### III.  *Increased Capacity Under 722 (b) (4).*

We have found as an ultimate fact that petitioner has failed to establish an increased capacity for production during the base period as a ground for relief within the meaning of section 722 (b) (4).  As far as the installation of Sutherland refiners is concerned, the evidence does not sustain petitioner's contention that it increased petitioner's

capacity to produce during the base period. If we grant petitioner's contention that

Capacity for production appears to be the ability of a given *plant* to produce that which it is designed to create or produce and is expressed in terms of the number of units manufactured, created or produced in a given period. * * * We see nothing different in principle in the question before us and believe that "capacity for. production" in the statute we now interpret means mere "average producing capacity in a given time," that is, actual ability to produce within a given time. * * * [*Jacob's Fork Pocahontas Coal Co.*, 17 T. C. 357, 363. Emphasis added.]

and, further, that the removal of an internal bottleneck within a plant such as its paper mill might bring about a qualifying increase in plant capacity even though the capacity of the ultimate board and paper machines remained the same, by permitting those machines to realize more of their output potential than had previously been possible, still the evidence does not support petitioner's assertion that the installation of the Sutherlands achieved this purpose. It is true that by 1939 all of the Sutherlands had been installed and the period was one which petitioner itself contends to be "normal" as a measure of production after all of its alleged changes in the character of its business, even without the benefit of the "push-back rule." It is also true that its total board production then exceeded that of 1936 and 1937. But closer analysis reveals that this increase was due almost entirely to petitioner's operation of its machines for a greater number of machine days during 1939 than in the prior years. On 1 of its 4 paper making machines, for example, its average production per machine day during 1939 was only a fraction of a ton (about 0.63 per cent) more than its average daily production in 1937, when installation of the Sutherland refiners was still in its initial stage.[10] Another comparison for this machine, by months in each of the base period years during which it was operated the most machine days, again discloses almost no variation in average daily production throughout the base period.[11] The evidence indicates that another paper machine averaged a greater daily production during some months in 1936 than in 1939. And the only substantial increase in production on the 2 remaining machines occurred between 1936 and 1937, an increase which we have

[10] Machine #3 :
    1937: 305.2 machine days operated; average daily production, 138.58 tons.
    1939: 320.9 machine days operated; average daily production, 139.45 tons.
Sutherland pulp refiners were not installed in front of this machine until November 1937.

[11]

| | Days operated | Total (ton) production |
|---|---|---|
| December 1936 | 28. 6 | 3, 909. 92 |
| July 1937 | 28. 7 | 4, 046. 56 |
| November 1938 | 28. 7 | 3, 975. 24 |
| November 1939 | 28. 2 | 3, 986. 45 |

found to be attributable directly to the installation of additional drying capacity on these machines rather than to an increased quantity of pulp supplied by the Sutherlands, which were not put into full-time use in front of these machines prior to that time.

Finally, we are satisfied that any slight increase in average producing capacity indicated by the output of the paper machines in 1939 is attributable either to such routine improvements as the increased drying capacity and other changes which petitioner does not urge as constituting a change in the character of its business within the meaning of section 722 (b) (4), or to the substantial changeover in 1939 from paper to board production, considered in the light of our finding that these machines were able to produce substantially more board than paper from kraft pulp within the same period of time. In view of these other circumstances, petitioner cannot be held to have sustained its burden of proving that the Sutherlands were capable of refining more pulp in a given time than did the Miami Jordan refiners, regardless of any improvements in the quality of the pulp.

When these circumstances are combined with a statement made by petitioner's own counsel in 1944 in connection with another proceeding involving petitioner's president, in which he wrote that "the Brown Paper Mill's capacity remained approximately the same" from 1932 through 1941, according to statistical data which he alleged to be "recognized authority," we conclude that petitioner has not sustained its burden of proving qualification on the basis of any increased plant capacity which may be traced directly and specifically to the Sutherland refiners.

To the extent that the claim of increased capacity is based on the installation of the McDonald dehydrators, it was not adequately raised or claimed prior to these proceedings, either in the original claims for relief or in the conference memoranda in support thereof. Claims and evidence dealing with the McDonalds were concerned solely with their effect as a change in method of operation in decreasing petitioner's costs of production. We may not consider them as a source of increased capacity for production for the first time in the Tax Court. *Blum Folding Paper Box Co.*, 4 T. C. 795; *Wadley Co.*, 17 T. C. 269.

## IV. *Changes in Method of Operation Under 722 (b) (4).*

We are satisfied, however, that both the McDonalds and the Sutherlands constituted changes in petitioner's method of operation within the meaning of section 722 (b) (4), and warrant a reconstruction of its net earnings on the basis of savings which would have resulted had petitioner's actual production been achieved at the lower power and chemical costs and other savings which would have been possible had these installations occurred earlier. These were not mere rou-

tine changes, such as were the increases in drying capacity. Nor were they mere improvements of older equipment or ordinary technological improvements developed to perform the same functions in the same manner, although at greater economic efficiency. Cf. *Suburban Transportation System*, 14 T. C. 823. The record clearly establishes that both the McDonalds and the Sutherlands were "substantially different processes of manufacturing" within the contemplation of section 722 (b) (4) and Regulations 112, section 35.722–3 (*d*) (1).

Having rejected petitioner's claim of increased capacity, the reconstruction of cost savings has been, of course, modified to the extent that it was originally measured by petitioner's proposed reconstructed production.

V. *Reconstruction*.

After a careful consideration of the entire record and all facts and circumstances relevant to the extent of petitioner's qualification for relief under section 722 (b) (4), and applying the principle of *Cohan* v. *Commissioner*, (C. A. 2) 39 F. 2d 540, where the record has so required, see *National Grinding Wheel Co.*, 8 T. C. 1278, *Morrow-Thomas Hardware Co.*, 22 T. C. 781, we have concluded that the evidence justifies the reconstruction of additions to petitioner's actual net income for each of the base period years to the extent indicated in our findings of fact, see *Lily Mills Co.*, 21 T. .C. 900, *Radio Shack Corporation*, 19 T. C. 756, amounts which are in excess of the adjustments previously granted by respondent [12] under section 713 (e). No adjustment for change in capital ratio may be permitted as an increase in the credit for the year 1940, however, in view of our conclusion that petitioner did not make timely application for relief based on this ground for that year.

Petitioner concedes that an adjustment will have to be made for its State income taxes during the base period years. It asserts that "this can be adjusted under a Rule 50 computation," apparently from figures already in evidence. Respondent challenges neither the propriety of such an adjustment in the event of some reconstruction, such as we shall in fact allow, nor the assumption that the record contains sufficient material to permit this adjustment to be accomplished in a recomputation. Any such adjustment in the constructive average base period net income may accordingly be left to the Rule 50 computation.

Issues Other Than Those Under Section 722.

*I*.

Originally petitioner deducted in full as current business expense, during the base period years, the payments made for the Sutherland

---

[12] See footnote 2, *supra*.

refiners which it leased under its contracts with Sutherland. It now seeks to treat these amounts as capital expenditures and to restore the deductions to base period income, while granting respondent's right to readjust its base period years income taxes under section 734 [13] because of this inconsistency. The parties have agreed upon proper rates of depreciation for both base period years and the taxable years in controversy in the event that petitioner's contention is upheld.

Granting that as to Sutherland the receipts in excess of cost were income, we cannot say that petitioner was mistaken in its original treatment of the payments from its own tax and accounting standpoints. Under the contracts, all it was assured of was the use of the machines for 1 year. It had not taken and was not taking title to the property within the purview of section 23 (a). As in *International Cigar Machinery Co.*, 36 B. T. A. 124, 140,

We do not intend to hold that the method of accounting used by the petitioner is the only correct one, * * *

But since in that case, on similar facts involving a lessor, there was

testimony * * * by well qualified accounting experts that it might have been proper [for the lessor] to treat the lump sum payments as deferred income spread over the life of the contracts and to deduct an equivalent amount annually for depreciation of the machines * * *

we are unwilling to say that, as lessee, petitioner erred in treating the payments as current expenses and not capital outlays.

In a proceeding in which Sutherland was the petitioner we decided in a Memorandum Opinion that payments made by petitioner for the

---

[13] Internal Revenue Code of 1939.

SEC. 734. ADJUSTMENT IN CASE OF POSITION INCONSISTENT WITH PRIOR INCOME TAX LIABILITY.

(b) CIRCUMSTANCES OF ADJUSTMENT.—

(1) If—

(A) in determining at any time the tax of a taxpayer under this subchapter an item affecting the determination of the excess profits credit is treated in a manner inconsistent with the treatment accorded such item in the determination of the income-tax liability of such taxpayer or a predecessor for a prior taxable year or years, and

(B) the treatment of such item in the prior taxable year or years consistently with the determination under this subchapter would effect an increase or decrease in the amount of the income taxes previously determined for such taxable year or years, and

(C) on the date of such determination of the tax under this subchapter correction of the effect of the inconsistent treatment in any one or more of the prior taxable years is prevented (except for the provisions of section 3801) by the operation of any law or rule of law (other than section 3761, relating to compromises),

then the correction shall be made by an adjustment under this seection. * * *

(2) Such adjustment shall be made only if there is adopted in the determination a position maintained by the Commissioner (in case the net effect of the adjustment would be a decrease in the income taxes previously determined for such year or years) or by the taxpayer with respect to whom the determination is made (in case the net effect of the adjustment would be an increase in the income taxes previously determined for such year or years) which position is inconsistent with the treatment accorded such item in the prior taxable year or years which was not correct under the law applicable to such year.

manufacture of machines were not income to Sutherland. *D. Manson Sutherland, Jr.*, Docket No. 110350, November 30, 1943.

Petitioner makes much of this decision and contends that it is inconsistent with any conclusion that the payments were for royalties, rentals, license fees, or other deductible items. We find nothing in the Sutherland opinion inconsistent with the foregoing conclusion. It was conceded by him that the excess over the cost of the machines is ordinary income. The present petitioner is referred to throughout as the licensee for payments made as rentals. Although under the *International Cigar* case, *supra*, the cost of the machines was held not to be income to Sutherland until he actually received them, see *Helvering* v. *Bruun*, 309 U. S. 461, there was no corresponding conclusion that the title to the machines ever passed to the licensee, or that the payments it made were capital in their nature. In fact it was noted that payments to the taxpayer there were similar to those made for the construction of transmission lines which were characterized from the standpoint of the person by whom the payments were made in the words "The payments were to the customer the price of the service." *Detroit Edison Co.* v. *Commissioner*, 319 U. S. 98.

Nor can we sustain petitioner's alternative contention that these were abnormal deductions under 711 (b) (1) (J) since we have already held that installation of the Sutherlands was a "change * * * in the manner of operation of petitioner's business," entitling it to some relief under section 722 (b) (4). We think it follows that it cannot qualify under section 711 (b) (1) (K) (ii), and petitioner in effect so concedes.

## II.

In otherwise upholding the amount previously allowed by respondent [14] as the proper average base period net income to which our reconstruction should be added, we conclude that respondent properly disallowed as adjusting deductions in 1940 under section 711 (a) (1) (A) amounts of $180,000 and $220,000 paid by petitioner pursuant to a settlement early in 1941 of its undistributed profits tax liability for the years 1936 and 1937, and properly included these amounts as deductions in the 2 base period years, respectively, under section 711 (b) (1) (A). These sections both provide that

The deduction for taxes shall be increased by an amount equal to the tax * * * *for* such taxable year * * * [Emphasis added.]

under the revenue laws applicable to such year. Petitioner correctly points out that respondent's adjustments rest on the theory that both subsections refer to the year for which the tax is payable, regardless

[14] As adjusted by stipulations herein, except for his adjustments under section 713 (e) (1).

of when the amounts were properly paid or accrued on its books. We agree with respondent's interpretation of these provisions. His interpolation of the word "payable" exactly restates the language by which Congress itself expressed its intention that for years beginning after December 31, 1939,

The deduction for taxes paid or accrued under the law applicable to the taxable year is to be increased by an amount equal to the amount of the tax * * * *payable for such taxable year* * * * [Emphasis added.]

and

For taxable years in the base period, the excess profits net income is determined in the same manner as described for taxable years beginning after December 31, 1939 * * * [H. Rept. No. 2894, 76th Cong., 3d Sess., p. 19.]

See also 7A Mertens, Law of Federal Income Taxation, 135.

Regardless of whether the 1941 payments in fact resulted in deductions properly accruable in 1940, which we do not now decide, cf. *Dixie Pine Products Co.* v. *Commissioner*, 320 U. S. 516, *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281, we hold that these payments constituted settlements of taxes properly payable for the years 1936 and 1937, and are consequently includible as deductions for those years under section 711 (b) (1) (A), as contended by respondent.

### III.

Petitioner no longer contends, as it did at the time of its latest amended petition, that "the Commissioner erred in failing to allow as a deduction for the year 1940 the capital stock tax paid by the petitioner in 1940 in the amount of $30,250." Petitioner now apparently concedes that $27,500 of this amount accrued on July 1, 1939, the beginning of the capital stock tax year, and argues solely that $2,750, "the increase in the rate of tax under the Revenue Act of 1940 which was approved on June 25, 1940 * * * accrued" in 1940. Respondent refused to permit the deduction of the increase in 1940, arguing that under *Veeder-Root, Inc.*, 11 T. C. 602, and G. C. M. 23251, 1942–2 C. B. 103, which that case approved, the increase was also accruable as of July 1, 1939.

It is by no means certain that the cases in this field can be reconciled. *Veeder-Root, Inc., supra,* did indeed approve G. C. M. 23251, *supra,* but the accrual of the 1940 increase in capital stock tax was placed in 1940, the end of the capital stock tax year, not in 1939; while in *William C. Atwater & Co.,* 10 T. C. 218, 249, upon which it relies, "Petitioner kept its books and filed its returns upon the accrual basis" but "did not accrue its capital stock tax liability until the calendar year in which the capital stock tax period ended and payment was

made" and it was held "This was error, as it was in effect placing these items on a cash basis." The year 1940 was not involved.

In *First National Bank in St. Louis*, 1 T. C. 370, we held squarely "that additional capital stock tax imposed by an act approved June 25, 1940, and applicable to the capital stock tax year beginning July 1, 1939, was not deductible by an accrual basis taxpayer for the calendar year 1939 because it did not accrue prior to the date of the enactment * * *" and "* * * in *Houston Natural Gas Corporation*, 9 T. C. 570 * * * accrual and deduction of additional capital stock tax was allowed in 1940 because imposed by the Act of June 25, 1940." *Tennessee Consolidated Coal Co.*, 15 T. C. 424, 439, 440.

Finally, in G. C. M. 22366, 1941–1 C. B. 210, the question was:

whether, for taxable years ended before the passage of the Revenue Act of 1940 imposing the additional tax, G. C. M. 17340 * * * [XV–2 C. B. 81, which directed the accrual of capital stock taxes as of July 1 at the beginning of each capital stock tax year] must be strictly applied and adjustment made in income tax returns which have already been filed in order to reflect the increased capital stock tax deduction, or whether the increase in such deduction may be taken in the succeeding taxable year * * *

G. C. M. 22366 concluded that accrual of the increase as of the prior July 1 should be required

only in those returns which are due subsequent to the date of enactment of the amending legislation * * * The Revenue Act of 1940 was approved on June 25, 1940. * * * With respect to taxable years ended on March 31, 1940, or prior thereto, it can not be said that the Revenue Act of 1940 was passed in ample time to permit an adjustment.

Petitioner filed calendar year returns and kept its books on an accrual basis. The application of this principle, see *Houston Natural Gas Corporation, supra,* to petitioner requires the holding that the increase in capital stock tax for 1939 in the amount of $2,750 was not properly accruable, and hence not deductible for Federal income tax purposes until the year 1940. Statements inconsistent with this result in the cases referred to have not heretofore been followed. *Tennessee Consolidated Coal Co., supra.*

### IV.

Respondent's allowance of an additional portion of the capital stock tax deduction for the year 1939 in the amount of $7,038.51 [15] in computing its average base period net income credit is claimed by petitioner to be inconsistent with respondent's prior refusal to allow its deduction for income tax purposes in the earlier year. Accepting the propriety of respondent's treatment to the extent of this amount, in

---

[15] The actual amount allowed by respondent was $9,788.51. In view of our holding that $2,750 of this amount was properly accruable and deductible in 1940, only $7,038.51 remains in controversy under this issue.

computing the income credit, *Veeder-Root, Inc.*, *supra*, we think the inconsistency too obvious for argument. See sec. 734, I. R. C., 1939; *Zellerbach Paper Co.*, 8 T. C. 511; *Leonard Refineries, Inc.*, 11 T. C. 1000.

Reviewed as to section 722 issues by the Special Division.

*Decisions will be entered under Rule 50.*